919 So.2d 969 (2005)
Terry MORAN and Mark Seymour, Sr., Appellants,
v.
James L. FAIRLEY, Jr., Appellee.
No. 2003-CA-01821-COA.
Court of Appeals of Mississippi.
May 10, 2005.
Rehearing Denied August 16, 2005.
Certiorari Dismissed January 5, 2006.
*971 Steven Alfred Kohnke, Ronald G. Peresich, Biloxi, J. Henry Ros, Johanna Malbrough McMullan, attorneys for appellants.
Cynthia A. Langston, attorney for appellee.
EN BANC.
BRIDGES, P.J., for the Court.
¶ 1. James Fairley, Jr. sued Terry Moran and Mark Seymour, Sr. in Harrison County Circuit Court. Fairley alleged (1) negligent misrepresentation, (2) fraud, and (3) breach of contract. Following the trial before the circuit court, the jury returned a general verdict for Fairley and awarded $975,000 in damages. Posttrial, Moran and Seymour filed unsuccessful motions for judgment notwithstanding the verdict, new trial, vacation or amendment of the judgment, and remittitur under Rules 50 and 59 of the Mississippi Rules of Civil Procedure. Aggrieved, Moran and Seymour appeal and assert seven issues, which we paraphrase for brevity's sake.
¶ 2. Moran and Seymour assert that Fairley presented insufficient evidence of (1) negligent misrepresentation, (2) fraud, (3) breach of contract, and (4) damages. Further, Moran and Seymour allege that (5) the verdict is against the overwhelming weight of the evidence and (6) the jury's award of $975,000 was the product of bias, passion, and prejudice and was contrary to the overwhelming weight of the evidence. Finally, Moran and Seymour claim that (7) the trial court erred in admitting certain irrelevant evidence.
¶ 3. Finding error, we reverse the decision of the circuit court and render judgment for Moran and Seymour.

FACTS
¶ 4. In 1992, James Fairley, Jr., Terry Moran, and Mark Seymour, Sr., among others, formed a limited partnership entity called D'Iberville Landing Casino, LP. The partnership's goal was to establish a casino *972 on property originally owned by Fairley and one other partner. The partnership called the property "D'Iberville Landing." Fairley, Moran, and Seymour each received a one-seventh interest in the partnership.
¶ 5. The partnership faced two obstacles that stalled its establishment of a casino at D'Iberville Landing: (1) finding a developer to build a casino at D'Iberville Landing, and (2) obtaining permits to build a casino at D'Iberville Landing. Regarding potential developers, the partnership engaged in negotiations with a group called Spectrum Gaming, but the Spectrum negotiations eventually fell through.
¶ 6. Regarding permit issues, wetlands comprise a portion of D'Iberville Landing. While the partnership was initially successful in obtaining the necessary permits, certain environmental groups, citing the presence of wetlands and the effect building a casino would have on those wetlands, sought to enjoin the group from building a casino at D'Iberville Landing. As time went on, the group became disheartened by the delays in reaching their goal of establishing a casino at D'Iberville Landing.
¶ 7. Meanwhile, Fairley experienced difficulty in another business venture. Fairley, along with his business partner, Bobby Taylor, owned and operated a restaurant on property separate from D'Iberville Landing. The restaurant became increasingly unprofitable and eventually faced impending foreclosure. Seeking to retain his ownership in the restaurant, Fairley entered into an agreement with Moran and Seymour. On May 22, 1997, Moran and Seymour agreed to bid up to $500,000 for the property at a foreclosure auction. The agreement contained a provision that Moran and Seymour were only obligated to bid on the property if the foreclosure initiated within sixty days of the contract date. At the same meeting, Fairley sold his one-seventh interest in D'Iberville Landing to Moran and Seymour for $150,000.
¶ 8. The People's Bank initiated foreclosure on June 25, 1997. That date was within the sixty day window contemplated in the foreclosure contract. However, Bobby Taylor, Fairley's partner in the restaurant, claimed an interest in the restaurant property so People's Bank abandoned their initial foreclosure and filed for judicial foreclosure on July 25, 1997. The filing for judicial foreclosure occurred four days after the sixty-day window expired. Moran and Seymour did not attend the foreclosure sale and the People's Bank bought the property for $200,000.
¶ 9. Eventually, Fairley sued Moran and Seymour on three causes of action: (1) negligent misrepresentation, (2) intentional misrepresentation (fraud), and (3) breach of contract. The negligent misrepresentation and fraud claims stem from Fairley's allegation that Moran and Seymour induced him to sell his interest in D'Iberville Landing. Fairley's breach of contract claim stems from Moran and Seymour's failure to bid on his restaurant property at the foreclosure sale. As mentioned, the jury returned a general verdict and determined that Moran and Seymour were liable to Fairley for $975,000.

ANALYSIS

I.

Did Fairley present sufficient evidence of negligent misrepresentation?
¶ 10. In the first issue presented to this Court for review, Moran and Seymour argue that the trial court erred in denying their motion for judgment notwithstanding the verdict because Fairley failed to prove the essential elements of negligent misrepresentation. Moran and Seymour request *973 that this Court review the circuit court's decision to deny Moran and Seymour's motion for judgment notwithstanding the verdict.
¶ 11. When reviewing the sufficiency of the evidence, we must examine all of the evidence, not just evidence supporting the non-movant's case, in the light most favorable to the non-moving party. Harrison v. McMillan, 828 So.2d 756(¶ 22) (Miss.2002). We are authorized to reverse if the evidence is such that reasonable and fair-minded jurors could not have found Moran and Seymour liable for negligent misrepresentation. See Edwards v. State, 797 So.2d 1049(¶ 14) (Miss.Ct.App.2001).
¶ 12. Fairley claims that he put on sufficient evidence to sustain a finding of negligent misrepresentation on behalf of Moran and Seymour.
In order to establish a prima facie case of negligent misrepresentation, a plaintiff is required to show: (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the defendant failed to exercise that degree of diligence and expertise the public is entitled to expect of it; (4) that the plaintiff reasonably relied on the defendant's representations; and (5) that the plaintiff suffered damages as a direct and proximate result of his reasonable reliance.
Skrmetta v. Bayview Yacht Club, Inc., 806 So.2d 1120(¶ 13) (Miss. 2002) (citing Spragins v. Sunburst Bank, 605 So.2d 777, 780 (Miss.1992)). The burden of proof in a negligent misrepresentation case falls on the plaintiff to prove each element by a preponderance of the evidence. Bank of Shaw, a Branch of Grenada Bank v. Posey, 573 So.2d 1355, 1360 (Miss.1990).
¶ 13. The first element of negligent misrepresentation, misrepresentation of a fact, must concern a past or present fact, as contrasted with a promise of future conduct. Spragins, 605 So.2d at 780. (citing Bank of Shaw, 573 So.2d at 1360-61). Moran and Seymour argue that Fairley's claim is not based on a present fact. They assert that Fairley's claim is based on a promise of future conduct.
¶ 14. Fairley testified that during board meetings, Moran and Seymour misrepresented to him that "there would never be a casino" at D'Iberville Landing.[1] (emphasis added). Is this a misrepresentation of a past or present fact or a promise of future conduct?
¶ 15. Where a bank officer, contacted by a third party regarding the credit worthiness of the bank's account holder, misrepresents that account holder's financial security while knowing such representations were false when made, such a misrepresentation may expose the bank to liability. Berkline Corp. v. Bank of Mississippi, *974 453 So.2d 699, 702 (Miss.1984). Thus a representation that "Jones is financially secure" is a past or present existing fact, rather than a promise of future conduct. Id.
¶ 16. Similarly, where a bank officer represents to an importer that a third party manufacturer made financial arrangements with the bank so the manufacturer could purchase the importer's materials, and the bank officer knew the manufacturer had not made such arrangements, such a misrepresentation may expose the bank to liability for negligent misrepresentation. Shogyo International Corp. v. First National Bank of Clarksdale, 475 So.2d 425, 427-28 (Miss.1985). Thus a representation that "Jones has made financial arrangements to purchase property" is a past or present existing fact, rather than a promise of future conduct. Id.
¶ 17. However, where a defendant misrepresents his commitment to loan money at particular terms, such a representation is insufficient to find that defendant liable for negligent misrepresentation because that misrepresentation does not concern a past or present existing fact. Bank of Shaw, 573 So.2d at 1360-61. Also where a defendant allegedly misrepresents to a plaintiff that a defendant bank would lend money to the plaintiff should a third party deny the plaintiff's loan application, such a representation does not concern a past or present fact and is, therefore, insufficient to convey liability for negligent misrepresentation. Id. Accordingly, we know that representations of "we will lend Jones money at certain terms" or "if Smith does not lend Jones money, we will" are both insufficient to convey liability for negligent misrepresentation.
¶ 18. Likewise, where a plaintiff alleges negligent misrepresentation based on a defendant's promise to buy real property at a prospective foreclosure sale, that alleged representation did not concern a past or present fact, but a promise of future conduct. Spragins, 605 So.2d at 780. Thus, an allegation of negligent misrepresentation cannot be based on a representation that "we will bid on that property when it is foreclosed upon." Finally, where a plaintiff based a negligent misrepresentation claim on an allegation that a defendant misrepresented to plaintiff that the defendant planned to build a hotel and, as a result, induced the plaintiff to sign a partnership agreement, that representation pertained to a promise of future conduct. Skrmetta, 806 So.2d at (¶ 16). This means an alleged misrepresentation of "we will build a hotel" is a promise of future conduct.
¶ 19. So is Fairley's claim like those in Berkline and Shogyo or those in Bank of Shaw, Spragins, and Skrmetta? The substance of Fairley's alleged misrepresentation is the alleged falsity of the statement that Moran and Seymour intended to abandon plans to develop a casino at D'Iberville Landing because they would never receive permission to build a casino at D'Iberville Landing. Reason dictates that a representation of "there will never be a casino" somewhere is a commitment to certain future conduct, just as a promise "there will be a hotel" somewhere is a promise of future conduct. See id. The only difference is that the former is a negative commitment to conduct, while the latter is an affirmative commitment to conduct. That is, one is a promise to do something, while the other is a promise never to do something.
¶ 20. No evidence suggests that Moran and Fairley ever promised to stop attempts to develop D'Iberville Landing as a casino site. No evidence suggests that Moran and Seymour misrepresented the status of the attempts to receive a permit *975 to develop a casino at D'Iberville Landing. Fairley did not allege that Moran and Seymour said "there cannot be a casino at D'Iberville Landing." Rather, Fairley claimed that Moran and Seymour said "there will never be a casino at D'Iberville Landing." (emphasis added). At the time of the trial and judgment in this case, there was still no casino at D'Iberville Landing.
¶ 21. What is more, there is no evidence in the record that indicates Moran and Seymour made the representation Fairley alleges at the time Fairley sold his interest in D'Iberville Landing. All testimony indicates that it was Fairley who offered to sell his interest to Moran and Seymour. Fairley testified that Moran and Seymour made the alleged representations at board meetings over a period of time. Accordingly, the circuit court erred by denying Moran and Seymour's motion for judgment notwithstanding the verdict because Fairley failed to prove negligent misrepresentation. We reverse the decision of the circuit court and render judgment for Moran and Seymour.

II.

Was there sufficient evidence to find fraudulent misrepresentation?
¶ 22. Moran and Seymour claim that Fairley did not submit sufficient evidence of fraudulent misrepresentation and that the trial court erred by failing to grant their motion for judgment notwithstanding the verdict. When reviewing the sufficiency of the evidence, we must examine all of the evidence, not just evidence supporting the non-movant's case, in the light most favorable to the non-moving party. Harrison, 828 So.2d at (¶ 22). We are authorized to reverse if the evidence is such that reasonable and fair-minded jurors could not have found Moran and Seymour liable for negligent misrepresentation. See Edwards, 797 So.2d at (¶ 14).
¶ 23. To demonstrate a prima facie case of intentional misrepresentation, a plaintiff must show, by clear and convincing evidence, (1) a representation (2) that is false (3) and material (4) that the speaker knew was false or was ignorant of the truth (5) combined with the speaker's intent that the listener act on the representation in a manner reasonably contemplated (6) combined with the listener's ignorance of the statement's falsity (7) and the listener's reliance on the statement as true (8) with a right to rely on the statement, and (9) the listener's proximate injury as a consequence. Southeastern Med. Supply, Inc. v. Boyles, Moak, and Brickell Ins. Inc., 822 So.2d 323(¶ 39) (Miss.Ct.App.2002) (citations omitted).
¶ 24. While one may prove negligent misrepresentation by a preponderance of the evidence, one must prove fraud by clear and convincing evidence. Id. Clear and convincing evidence is:
that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
Travelhost, Inc. v. Blandford, 68 F.3d 958, 960 (5th Cir.1995) (citations omitted). Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level. In re C.B., 574 So.2d 1369, 1375 (Miss.1990).
¶ 25. Here, Fairley's allegations of negligent and intentional misrepresentation are based on the same exchange or set of events. Fairley alleges fraud in Moran *976 and Seymour's comments in board meetings that "there would never be a casino at D'Iberville Landing." Fairley faces the same hurdles in proving his fraud claim as he faced in proving negligent misrepresentation. A successful claim for fraudulent representation must relate to past or present existing facts, and cannot be based on a promise, except where a contractual promise is made with the present undisclosed intention of non-performance. Skrmetta, 806 So.2d at (¶ 17) (citations omitted).
¶ 26. As mentioned in our analysis of Fairley's negligent misrepresentation claim, Fairley's allegation of fraud is not sufficient to sustain a verdict. Moran and Seymour's representations are not based on past or present facts. None of those statements were regarded as contractual promises. Further, Moran and Seymour's statement was true at the time they spoke. There was no developer interested in building a casino at D'Iberville Landing at that time. Moreover, pending the outcome of the environmental litigation, it is possible that there never would be a casino at D'Iberville Landing. At the time of the trial and the judgment rendered in this case, there was no casino at D'Iberville Landing.
¶ 27. Fairley did not present clear and convincing evidence that Moran and Seymour intended for Fairley to sell his interest in D'Iberville Landing when they made their statement that serves as the basis of Fairley's fraud claim. The only evidence of any alleged misrepresentation came from Fairley's testimony. Fairley testified that Moran and Seymour made their statements at board meetings, over a period of time. No evidence suggests that they induced Fairley to sell his interest at the time he sold it. In fact, Fairley approached Moran and Seymour and offered to sell his interest. The record suggests that Fairley knew Moran and Seymour still wanted to build a casino.
¶ 28. Because of Fairley's failure to present a prima facie case of fraud, no reasonable juror, even properly instructed, could have found in favor of Fairley. See Herrington v. Spell, 692 So.2d 93, 97 (Miss.1997). The trial court committed error by presenting Fairley's claim of fraudulent misrepresentation to the jury, as the evidence was not sufficient to create an issue upon which reasonable jurors could disagree. Daughtry v. Kuiper, 852 So.2d 675(¶ 12) (Miss.Ct.App.2003). Accordingly, we reverse the judgment of the circuit court and render judgment for Moran and Seymour.

III.

Was there sufficient evidence to establish breach of contract?
¶ 29. Fairley's claim for breach of contract stems from the agreement between Moran and Seymour obligating Moran and Seymour to bid up to $500,000 on property owned by Fairley and Bobby Taylor. The agreement made that obligation conditional upon foreclosure proceedings being initiated within sixty days of entering the agreement.
¶ 30. Moran and Seymour argue that there is no evidence of breach of the contract to purchase property because the foreclosure proceedings were not within the sixty-day window contemplated by the contract. They argue that while a foreclosure proceeding was initiated within that period, that proceeding stopped and no sale occurred. Additionally, they contend that People's Bank initiated the judicial proceeding that resulted in the sale of the property outside the sixty-day window of the contract, so they were not obligated to bid at the resulting foreclosure sale.
*977 ¶ 31. Fairley responds that Moran and Seymour breached the contract because foreclosure proceedings were initiated within the sixty-day contract window. Fairley states that the fact that those proceedings never reached fruition only leads to more than one reasonable interpretation of the contract and, accordingly, was an issue for jury interpretation and resolution. We disagree.
¶ 32. First, we must attempt to ascertain the parties' intent by examining the language contained within the four corners of the instrument. Pursue Energy Corp. v. Perkins, 558 So.2d 349, 352 (Miss. 1990) (citations omitted). The contract stated that: "[i]n the event that The People's Bank and/or Southern Mississippi Planning and Development District, Inc., initiates foreclosure proceedings on [Fairley's restaurant property] within 60 days form [sic] the date hereof, then in such event Mark M. Seymour, Sr., and Terry Moran hereby agree to bid at said foreclosure the sum of $500,000 for subject property." Clearly, the contract obligated Moran and Seymour to bid on a foreclosure sale resulting from said foreclosure. That connected the foreclosure sale to a foreclosure initiated within sixty days of entering the contract.
¶ 33. There is no requirement to bid at a later foreclosure proceeding on the restaurant, but only to bid at a foreclosure initiated within sixty days. Accordingly, there is no evidence among the record that would obligate Moran and Seymour to bid on a foreclosure sale resulting from a foreclosure proceeding initiated outside the sixty-day window. As there is no evidence supporting the contention that Moran and Seymour committed a breach of contract, this issue is reversed. We render judgment for Moran and Seymour
¶ 34. Having rendered judgment for Moran and Seymour on the issues of negligent misrepresentation, fraud, and breach of contract, the four remaining issues are moot.
¶ 35. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, FINDING NEGLIGENT MISREPRESENTATION, INTENTIONAL MISREPRESENTATION, AND BREACH OF CONTRACT, IS REVERSED AND RENDERED FOR THE APPELLANTS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY CHANDLER, J. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY KING, C.J. LEE, P.J., NOT PARTICIPATING.
CHANDLER, J., DISSENTING:
¶ 36. With respect, I dissent from the majority's decision to render a judgment for the defendants on all issues. I join Judge Irving's separate opinion to the extent that it reasons that sufficient evidence existed to support Fairley's recovery for breach of contract. I write separately because, based on my review of the proceedings below, there was also sufficient evidence to support Fairley's claim of fraudulent misrepresentation. I would affirm the jury's verdict for Fairley.
¶ 37. The majority concludes that Fairley could not recover for negligent or fraudulent misrepresentation as a matter *978 of law.[2] This conclusion wholly rests upon the majority's supposition that the misrepresentation at issue was the statement, "there will never be a casino" at D'Iberville Landing, which Fairley testified that Moran and Seymour made at board meetings. Based on Skrmetta and other precedent, the majority finds that this misrepresentation consisted of a promise of future conduct, not a past or present fact, and, therefore, the jury verdict in this case must be reversed and rendered.
¶ 38. While the statement, "there will never be a casino" at D'Iberville Landing may well be a negative commitment to future conduct, my review of the record indicates that this statement was not the misrepresentation actually at issue in this case. According to the minutes of a 1996 board meeting, the D'Iberville Landing partnership planned to contact potential casino operators regarding developing a casino at the site, including Alan Paulson, a wealthy casino developer. Fairley testified that, in spring 1997 board meetings, Moran and Seymour directly told him that Paulson was not interested in putting a casino at the D'Iberville site, that Paulson was in fact interested in another site, and that no casino operator was interested in the D'Iberville site. Thus, according to Moran and Seymour's representations to Fairley, Paulson had pulled out of negotiations regarding the D'Iberville site. Walter Gibbes, another partner, testified that Moran and Seymour had made these representations to him also.
¶ 39. Evidence concerning the truth of these representations was thoroughly developed at the trial. Both Fairley and Walter Gibbes sold their partnership interests on May 22, 1997. In July 1997, Moran and Seymour purchased options to buy nearby properties to expand the D'Iberville site. In approximately August 1997, Paulson bought a tract of land at the D'Iberville site and docked his boat there. In October 1997, the partnership and Paulson's company, Carlo, Inc., jointly applied for a permit to locate a casino at the site. The permit application included the results of various studies on the effect the planned casino would have on the environment and economic climate. There was testimony that these studies would have taken months to complete. Paulson's name appears on letters from the D'Iberille mayor's office concerning highway construction and tax incentives for Paulson to accommodate the casino project. In their testimony, Moran and Seymour maintained that Paulson was never interested in developing a casino at the site, and that they never had an agreement with Paulson to develop a casino at the site. Considering the development of Fairley's misrepresentation claim at the trial, the claim did not rest upon the promised future condition that there would never be a casino at the site, but upon Moran and Seymour's representation that Paulson was not interested in a casino development deal and had ceased negotiations.
¶ 40. In fact, that was the misrepresentation on which the jury was actually instructed. When the court heard objections to proposed jury instructions, the court recognized that a claim of fraudulent misrepresentation requires that the statement represent a past or existing fact, not future conduct. Therefore, the jury was given the following instruction on the elements it had to find in order to hold Moran *979 and Seymour liable for a fraudulent misrepresentation in the sale of Fairley's partnership interest:
You are instructed that a contract will be held invalid for fraudulent representations if the representations were made with the knowledge of their falsity, without the knowledge of their truth, or under such circumstances that their falsity ought to have been known; if the representations were material and were of a type which the other party to the contract might reasonably relay (sic) on; and if the other party to the contract did rely on them in entering into the contract.
Accordingly, if you find by clear and convincing evidence in this case that:
1. Terry Moran and Mark Seymour made representations that Alan Paulson and/or any other casino operator would not locate at the D'Iberville site to Jim Fairley with knowledge of their falsity, without knowledge of their truth, or under such circumstances that their falsity ought to have been known to Terry Moran and Mark Seymour.
2. The representations were material and were of a type of which Jim Fairley might reasonably rely; and
3. Jim Fairley did rely on them and enter into the contract; and
4. Jim Fairley suffered damages as a result of those representations, then your verdict shall be for Jim Fairley. However, if you find that Jim Fairley has failed to prove any of these four elements by clear and convincing evidence, your verdict shall be for Terry Moran and Mark Seymour.
(emphasis added). Thus, the misrepresentation claim was actually based upon Moran and Seymour's alleged representations that Alan Paulson and/or another casino operator would not locate at the D'Iberville site. Rather than a statement of future conduct, the misrepresentation upon which the jury was instructed referenced a past or present condition, namely, that Paulson and/or another casino operator had declined to locate at the site.
¶ 41. Having recognized the misrepresentation that was actually at issue in this case, I would find that there was sufficient evidence of fraudulent misrepresentation to create a jury question. The elements of fraud are:
(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.
Mabus v. St. James Episcopal Church, 884 So.2d 747, 762(¶ 32) (Miss.2004). Regarding the first element, both Fairley and Gibbes testified that Moran and Seymour made representations at board meetings that Paulson and other operators were not interested in locating at the D'Iberville site. The representations were material because they impacted the purpose of the partnership, which, according to the partnership contract, was to develop a casino at D'Iberville. Regarding the falsity of the representations and the defendant's knowledge thereof, there was evidence that, shortly after Moran and Seymour represented that Paulson was not interested in the D'Iberville site, they purchased options to expand the D'Iberville site, sold land at the site to Paulson, and submitted a joint application with Paulson's company for a casino permit that involved months of planning and studies. A reasonable jury could infer from the evidence of Moran and Seymour's activities with Paulson after Fairley's sale of his interest that, at the time Moran and Seymour made the representations *980 to Fairley, Paulson was in fact interested developing a casino at D'Iberville and that Moran and Seymour were aware of Paulson's position.
¶ 42. There was evidence that Fairley might reasonably rely on the misrepresentation. Fairley knew Moran and Seymour had been in negotiations with Paulson regarding the site, and, therefore, they would be the persons who would be expected to communicate to the partnership that negotiations had ceased. Fairley testified that he sold the property in reliance on Moran and Seymour's representations that Paulson was not interested and there were no other interested casino developers. Since partners have a duty to communicate "true and full information of all things affecting the partnership to any partner" Fairley had a right to rely on the representation. Miss.Code Ann. § 79-12-39 (Rev.2001). And, Moran and Seymour could have reasonably contemplated that Fairley would sell his partnership interest in reliance on the representations; Moran and Seymour told Fairley the outlook for finding an casino operator was so bleak that they were considering selling their own partnership interests.
¶ 43. Finally, the evidence that the partnership did plan a casino with Paulson after Fairley sold out showed that Fairley was proximately injured by the misrepresentation. Paulson died in 1999. Since there was evidence that a casino was planned with Paulson and that Paulson died in 1999, the jury reasonably could have concluded that, but for Paulson's death, the casino plans would have gone forward. Though no casino existed at the time of the trial, the partnership recently had executed a contract to sell the D'Iberville site to another casino developer. Thus, had Fairley not sold his one seventh interest, he would have had a one seventh interest in that sale contract.[3] Clearly, viewing the evidence in the light most favorable to the verdict, there was sufficient evidence to create a jury question as to whether the facts demonstrated that Moran and Seymour fraudulently induced Fairley to sell his partnership interest. Moreover, I believe there was sufficient evidence of the lease value of the D'Iberville site and the value of certain land adjacent to the partnership's land to support the jury's damage award. Therefore, I dissent.
KING, C.J., JOINS THIS SEPARATE WRITTEN OPINION.
IRVING, J., CONCURRING IN PART, DISSENTING IN PART:
¶ 44. I agree with the majority that the evidence is insufficient to warrant a finding that Fairley sustained his burden of proof on the issues of negligent and fraudulent representation. However, I disagree with the majority's conclusion that the evidence was insufficient to establish a breach of the contract in which Terry Moran and Mark Seymour, Sr. agreed to bid $500,000 for property owned by Fairley in the event The People's Bank and/or Southern Mississippi Planning & Development District, Inc. initiated foreclosure against the property within sixty days from the date of the agreement. Therefore, I respectfully dissent from that portion of the majority's opinion and the ultimate result it reaches.
¶ 45. For the reasons explained below, I would reduce the $975,000 judgment to $300,000.
¶ 46. On May 22, 1997, Moran, Seymour and Fairley entered into an agreement *981 in which they agreed, in case of the initiation of a foreclosure of certain property owned by Fairley, Moran and Seymour would bid $500,000 for the property. Specifically, the agreement stated in pertinent part:
¶ 47. Whereas, Fairley is the owner of that certain property described on Exhibit "A" hereto (the "Property"); and,
Whereas, said Property may be sold at foreclosure; and
Whereas, the parties hereto have entered into an Option Agreement executed contemporaneously herewith.[4]
Therefore, the parties agree as follows:
In the event that The People's Bank and/or Southern Mississippi Planning & Development District, Inc., initiates foreclosure proceedings on the property described on Exhibit "A" within 60 days from the date hereof, then in such event Mark M. Seymour, Sr., and Terry Moran hereby agree to bid at said foreclosure the sum of $500,000.00 for subject property.
In the event any amount in excess of $500,000 is bid by any party at said foreclosure, Fairley agrees that all amounts bid over and above $500,000.00 shall be paid over to Moran and Seymour.
¶ 48. In May, 1997, The Peoples Bank instructed the trustee in the deed of trust, which Fairley had given to The Peoples Bank, to initiate foreclosure on the property. The record contains the following relevant testimony on this issue:
Q. You initiated a foreclosure proceeding in this case to attempt to foreclose against Jim Fairley on some property in D'Iberville, did you not?
A. Yeah, I did as trustee for the Peoples Bank.
Q. Yes, sir. And do you recall when you initiated these foreclosure proceedings, Mr. Page?
A. I believe in May of 1997.
Q. May of 1997. And shortly thereI believe you testified you opened your file in May. Is that correct?
A. I did.
Q. And shortly thereafter youhow did you initial [sic] foreclosure proceedings?
A. At the request of the bank we had the title examined to the property. I was the trustee in the deed of trust, prepared the notice, delivered it to the newspaper, I think the Biloxi Press at the time, posted a copy of the notice at the courthouse in Biloxi.
Q. And all that was done in June of 1997, began in June of 1997?
A. It began in June of 1997, right.
Q. Okay. That is what initiates a foreclosure.
A. I believe so, yes.
Q. Now, you later began a judicial foreclosure, did you not?
A. Yes.
Q. In that case. But the actual foreclosure proceedings was initiated in June of 1997?
A. Correct. I might add that that was never completed. The initial foreclosure was never completed.
Q. Yes, sir. It was never completed, but the foreclosure proceeding began in June of 1997.
A. It did.
* * * *
Q. Okay. The foreclosure proceeding that was first initiated in June of *982 1997 called for a sale of the property at the courthouse, did it not?
A. Yes, it did. The Biloxi courthouse.
Q. The Biloxi courthouse. And notice of that was in the publications?
A. Yes.
Q. Did you attend that foreclosure?
A. No. There never was a foreclosure pursuant to that notice. That was canceled, and I didn't appear at the courthouse.
Q. Then subsequently you filed a judicial foreclosure?
A. Correct.
¶ 49. Without a doubt, The Peoples Bank initiated foreclosure on Fairley's property within the sixty-day window specified in the parties' agreement. The majority finds that there was no breach of the agreement because no foreclosure sale resulted from the initiation of foreclosure proceedings which undeniably initiated during the sixty-day window.
¶ 50. I find the majority's construction of the contract both unreasonable and illogical. First, the agreement only requires that foreclosure proceedings be initiated within sixty days, not that the sale be consummated within sixty days. Second, there was never a cessation of the foreclosure proceedings. The fact that The Peoples Bank changed the nature of the foreclosure procedure from administrative to judicial is of no relevant consequence. On June 25, 1997, The Peoples Bank posted and published notice that Fairley's property would be sold on July 25, 1997. For reasons that are not entirely clear, the bank canceled the administrative sale. However, on the same day that the property was scheduled to be sold pursuant to the administrative foreclosure proceedings (July 25, 1997), the bank filed a complaint initiating a judicial foreclosure.
¶ 51. On this set of facts, only one conclusion is reasonable: The Peoples Bank initiated foreclosure proceedings against Fairley on June 25, and on July 25, changed the manner in which it would accomplish the goal of the foreclosure, but not the foreclosure itself.
¶ 52. When the judicial sale was held, neither Moran nor Seymour showed up to bid the $500,000 as they were obligated to do. Consequently, the property was purchased by The Peoples Bank for $200,000. Had Moran and Seymour not breached their agreement to bid $500,000 at the sale, $300,000 more would have been realized from the sale. Therefore, I would find that Moran and Seymour owe Fairley $300,000 and would reduce the judgment to that amount.
¶ 53. For these reasons, I respectfully dissent.
CHANDLER, J., JOINS IN PART.
NOTES
[1] The exact source of Fairley's misrepresentation claim has resulted in confusion. For example, portions of Moran and Seymour's brief address the claim that Moran and Seymour misrepresented Paulson's potential interest in developing a casino at D'Iberville Landing. However, Fairley's brief expressly and repeatedly states the substance of his misrepresentation claim.

Page sixteen of Fairley's brief states "[t]he Defendants also assert that Fairley failed to put forward any evidence which would tend to show their intent to construct a casino with Paulson, aside from his own supposition and naked allegation. Not only is this false, but it's also irrelevant. The question is not whether the Defendants intended to construct a casino with Paulson . . . rather it is whether the Defendants knew that it might be possible to build a casino on the site at the time they represented to Fairley that it would never be possible to do so." This assertion amounts to a waiver of any argument that Fairley's misrepresentation claim is based on Paulson's interest in developing a casino at D'Iberville Landing.
[2] I note that the jury was not instructed on the elements of negligent misrepresentation and, in fact, a jury instruction defining negligence was refused. No party raises the refusal of the instruction as error. Therefore, the jury could not have based its verdict on the theory of negligent misrepresentation and I do not address the sufficiency of the evidence of that claim.
[3] At the time of the trial, Fairley retained a one seventh interest in the partnership resulting from his settlement agreement with two other partners who were initially involved in this lawsuit.
[4] The option gave Moran and Seymour the option to purchase the property for $500,000.