ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Bruce and Claudia Niebanck appeal the decision of the DeSoto County Chancery Court finding that the Niebancks failed to sustain their claim that they had adversely possessed two sections of property: one that belonged to Robert D. Block (Dale) and one that belonged to Myfís C. Wims and Angela D. Wims. The Niebancks argue that the chancellor erred when she found that they had not adversely possessed the properties at issue. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. This dispute among neighbors centers on the ownership of two separate but adjacent parcels of property located in De-Soto County, Mississippi. At one time, William H. Austin, Jr., owned a large contiguous section of property. The litigants in this case all obtained property that originated from Austin’s ownership. In 1991, the Niebancks acquired 25 acres of property that had once belonged to Austin and his family. In July 2005, the Wimses acquired approximately 22.4 acres that had originated from Austin’s ownership. At the same time,' Dale acquired 10.01 acres of property that had originated from Austin’s ownership.
 

 ¶ 8. Dale’s property and the Wimses’ property are both north of the Niebancks’ property. To be specific, Dale’s and the Wimses’ southern property lines are the Niebancks’ northern property lines. Dale’s western property line is the Wims-es’ eastern property line. This dispute focuses on the property line that the Nie-bancks share with both Dale and the Wimses.
 

 ¶4. The underlying litigation was set into motion at approximately the same time that Dale and the Wimses worked together to dig a trench to run power lines to their respective properties. Certain factual matters surrounding the initial dispute will be discussed in greater detail in the analysis portion of this opinion. Suffice it to say, it became clear to everyone involved that there was some confusion regarding the location of the Niebancks’ northern boundary line.
 

 ¶ 5. On February 26, 2006, Bruce sent separate letters to Myfis and Dale. In the letter to Myfis, Bruce stated as follows:
 

 [Claudia and I] have believed the property to the fence and including the fence was ours and have used and maintained said property for over 14 years. However, in fairness and with neighborly consideration and as previously discussed between yourself, my wife and I, we are offering at this time to purchase, at a price of $5,00[0] per acre, that portion of property that lies between the surveyed line and the pre-existing fence line. As the enclosed map indicates this is .4 acres [sic]. The purchase price would be $2,000 plus closing costs.
 

 Bruce included practically identical language in his letter to Dale. However, rather than .4 acre of property, Bruce stated that he believed he owned a ,7-acre section of Dale’s property. Bruce offered to purchase the .7-acre section of property at the same rate. That is, Bruce offered to buy
 
 *1263
 
 the .7-acre section of property at the rate of $5,000 per acre for a total of $3,500.
 

 ¶6. On March 21, 2006, attorney Kimberly S. Jones wrote a response letter to Bruce. Writing on behalf of Dale and the Wimses, Jones informed Bruce that neither Dale nor the Wimses were interested in selling their property. Additionally, the attorney for Dale and the Wimses informed the Niebancks that they had thirty days to remove a fence that encroached on the properties that belonged to Dale and the Wimses or they would “be forced to remove the fence themselves.”
 

 ¶ 7. On April 18, 2006, the Niebancks sued Dale and the Wimses. According to the Niebancks, they had adversely possessed a .4-acre section of the Wimses’ property and a .7-acre section of Dale’s property.
 
 [1]
 
 Additionally, the Niebancks requested that the chancellor grant a preliminary injunction enjoining Dale and the Wimses from removing any fences from their properties or using the disputed properties in any way. Finally, the Nie-bancks requested that the chancellor grant a permanent injunction restricting the same conduct after hearing the Niebancks’ claims.
 

 ¶ 8. On November 7, 2008, the parties went to trial. The Niebancks called four witnesses during their case-in-chief: My-fis, Dale, Bruce, and Claudia. Their testimonies will be discussed in detail as necessary. Suffice it to say that Myfis, Dale, Bruce, and Claudia testified regarding the background of the dispute and their respective positions regarding ownership of the disputed properties. Dale also testified during the defense’s case. Otherwise, the defense called just one other witness: Austin. Both of the Niebancks testified again during the rebuttal portion of their case. After brief arguments summarizing the parties’ positions, the chancellor issued an oral ruling finding that the Niebancks failed to meet their burden of proof. Accordingly, the chancellor dismissed the Niebancks’ complaint. The chancellor entered a written order dismissing the Nie-bancks’ complaint on January 16, 2009. The Niebancks filed a motion for new trial or, alternatively, to amend the judgment. The chancellor denied the Niebancks’ post-trial motions. Aggrieved, the Niebancks appeal.
 

 STANDARD OF REVIEW
 

 ¶ 9. This Court is bound by a limited standard of review when reviewing a chancellor’s decision.
 
 Ellison v. Meek,
 
 820 So.2d 730, 734 (¶ 11) (Miss.Ct.App.2002). “When reviewing a chancellor’s decision, we will accept a chancellor’s findings of fact as .long as the evidence in the record reasonably supports those findings. In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied.”
 
 Peagler v. Measells,
 
 743 So.2d 389, 390 (¶ 6) (Miss.Ct.App.1999). “The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony.”
 
 Ellison,
 
 820 So.2d at 734 (¶ 11) (citation omitted). The standard of review for questions of law is de novo.
 
 Id.
 

 ANALYSIS
 

 ¶ 10. The Niebancks claim the chancellor erred when she found that they had failed to demonstrate a prima facie case of adverse possession. Mississippi
 
 *1264
 
 Code Annotated section 15-1-13(1) (Rev. 2003) provides as follows:
 

 Ten (10) years’ actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title....
 

 Accordingly, one asserting a claim of adverse possession must prove that the possession is “(1) under claim of right; (2) actual; (3) open, notorious and visible; (4) exclusive; (5) continuous and uninterrupted for ten years; and (6) peaceful.”
 
 Stallings v. Bailey,
 
 558 So.2d 858, 860 (Miss.1990) (citations omitted). Additionally, one asserting a claim of adverse possession must demonstrate by clear and convincing evidence that each element was met.
 
 Cook v. Robinson,
 
 924 So.2d 592, 595 (¶ 11) (Miss.Ct.App.2006). Clear and convincing evidence has been defined as follows:
 

 that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact[-]finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
 

 Moran v. Fairley,
 
 919 So.2d 969, 975 (¶ 24) (Miss.Ct.App.2005) (quoting
 
 Travelhost, Inc. v. Blandford,
 
 68 F.3d 958, 960 (5th Cir.1995)). “Clear and convincing evidence is such a high standard [of proof] that even the overwhelming weight of the evidence does not rise to the same level.”
 
 Id.
 
 (citing
 
 In re C.B.,
 
 574 So.2d 1369, 1375 (Miss.1990)).
 

 A. Open, notorious, and visible
 

 ¶ 11. “A landowner must have notice, actual or imputable, of an adverse claim to his property in order for it to ripen against him, and the mere possession of land is not sufficient to satisfy the requirement of open and notorious.”
 
 Warehousing Mgmt., LLC v. Haywood Props., LP,
 
 978 So.2d 684, 687 (¶ 17) (Miss.Ct.App.2008) (quoting
 
 Scrivener v. Johnson,
 
 861 So.2d 1057, 1059 (¶ 6) (Miss.Ct.App.2003)). Stated differently, one who seeks to acquire property by adverse possession “must unfurl his flag on the land, and keep it flying, so that the [actual] owner may see, and if he will, [know] that an enemy has invaded his domains, and planted the standard of conquest.”
 
 Blankinship v. Payton,
 
 605 So.2d 817, 820 (Miss.1992).
 

 ¶ 12. “In most cases, the underlying question is whether the possessory acts relied upon by the would-be adverse possessor are sufficient to put the record title holder upon notice that the lands are held under an adverse claim of ownership.”
 
 Cook,
 
 924 So.2d at 595 (¶ 12) (citation omitted). According to the Niebancks, because it is undisputed that they purchased their 25-acre section of property in 1991, “[t]here does not appear to be any doubt that the[y] [held the] property ... under [a] claim of ownership ... for at least the ten[-]year statutory period of time.” However, the Niebancks sought to acquire property that was beyond the bounds of the 25-acre section of property that they had purchased. Simply because the Nie-bancks purchased property in 1991 does not automatically mean that they held property other than that which was described in the 1991 deed under a claim of ownership.
 

 ¶ 13. The Niebancks also argued that the presence of an old barbed wire fence north of their actual boundary line caused them to believe that they owned
 
 *1265
 
 the disputed property. Precedent has stated that: “If a fence encloses the property for a period of at least ten years, under a claim of adverse possession, title vests in the claimant and possessor, even though the fence was subsequently removed or fell into disrepair.”
 
 Roy v. Kayser,
 
 501 So.2d 1110, 1112 (Miss.1987) (quoting
 
 Cole v. Burleson,
 
 375 So.2d 1046, 1048 (Miss.1979)). However, the Niebancks did not build the fence. During his direct examination, Austin was asked whether the fence was intended to be a boundary fence. Austin responded as follows:
 

 There is no fence in there that was ever considered or characterized to be a boundary fence whatsoever. There was a little fence in there at one time because my son was young and I always gave him chores and I required him to cut the back yard and he didn’t exactly know where to stop and we had — as I have already testified we had cows over all this property and so we just stuck up a fence as we stuck up fences from time to time to keep them back out of the corn field or bean field or whatever and they certainly were not property line fences in any stretch of the imagination.
 

 At the time of trial, the fence was nearly pulled down due to vines and other plants growing on the fence. “[T]he mere existence of a fence near the actual boundary line does not establish that the fence is the accepted boundary between the properties.”
 
 Cook,
 
 924 So.2d at 595 (¶ 13) (quoting
 
 Ellison,
 
 820 So.2d at 735 (¶ 16)). Furthermore, the Niebancks’ metes and bounds description within the Niebancks’ deed describes their northern boundary as being a straight line between the northwest corner and the northeast corner of their property. The fence was not built in a straight line. Instead, it contains two angles in which the fence line shifts to the northeast. Consequently, the manner in which the fence line is situated clearly conflicts with the description within the Niebancks’ deed.
 

 ¶ 14. Additionally, the Niebancks point out that they sometimes invited children and groups from their church to visit their property. They also allowed emergency management agencies to conduct training exercises on their property. Though the Niebancks testified that they had invited those groups to their property, it is unclear whether or how often those groups used the property at issue. In any event, the Niebancks purchased the property in 1991, and Claudia testified that the last time they had any such groups to their property was in the late 1990s. Accordingly, those sporadic activities did not take place for the statutory ten-year time period. We cannot find that the chancellor abused her discretion when she found that the Niebancks had failed to demonstrate by clear and convincing evidence their open, notorious, and visible possession of the disputed property.
 

 B. Actual or hostile
 

 ¶ 15. “Actual possession is ‘effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses.’ ”
 
 Warehousing Mgmt., LLC,
 
 978 So.2d at 688 (¶ 20) (quoting
 
 Wicker v. Harvey,
 
 937 So.2d 983, 993-94 (¶ 34) (Miss.Ct.App.2006)). “An occupant of land who mistakenly believes the land lies within the boundaries established by his own deed, when the land actually belongs to another, may acquire title to that land by adverse possession.”
 
 Id.
 
 (citations omitted).
 

 ¶ 16. “In most cases, the underlying question is whether the possessory acts relied upon by the would-be adverse possessor are sufficient to put the record title holder upon notice that the lands are held under an adverse claim of ownership.”
 
 *1266
 

 Cook,
 
 924 So.2d at 595 (¶ 12) (citation omitted). According to the Niebancks, because it is undisputed that they purchased their 25-acre section of property in 1991, “[t]here does not appear to be any doubt that the property has been held under claim of ownership by [the Niebancks] for at least the ten[-]year statutory period of time.” However, the Niebancks sought to acquire property that was beyond the bounds of the 25-acre section of property that they purchased. Simply because the Niebancks purchased property in 1991 does not automatically mean that they held property other than that which was described in the 1991 deed under a claim of ownership.
 

 ¶ 17. Additionally, we cannot find that the chancellor erred when she held that the Niebancks failed to submit clear and convincing evidence that they did not have permission to use the property from the predecessor in title to both Dale’s and the Wimses’ properties. Claudia testified that she asked Austin for permission to ride horses on his property. Claudia also testified that Austin gave her permission to do so. Austin corroborated Claudia’s testimony. The Niebancks attempted to possess property adversely that was south of an old barbed wire fence. The Niebancks’ attorney attempted to rehabilitate Claudia’s testimony by having her testify that she thought she was receiving permission to use Austin’s property north of that barbed wire fence. However, as Dale and the Wimses discuss in their brief:
 

 Regardless of what [Claudia] might have thought or believed, it was [Austin’s] understanding that he was granting permission for the Niebancks to be present on any property he owned north of the Niebancks 25[-]acre tract. Therefore, even if [Austin] had seen the Niebancks and their horses on the disputed 1.1 acre, he would have [had] no reason to believe that they were asserting hostile ownership of the property. He would have assumed that they were present pursuant to his permission^] and he would have no reason to assert his continued ownership to them.
 

 “If possession is permitted by the owner, it cannot be adverse.”
 
 Peagler,
 
 743 So.2d at 391 (¶ 9). “Adverse possession is totally inconsistent with that of permissive use.”
 
 Thornhill v. Caroline Hunt Trust Estate,
 
 594 So.2d 1150, 1153 (Miss.1992). Accordingly, we cannot find that the chancellor erred when she found that the Niebancks had failed to demonstrate by clear and convincing evidence actual, hostile possession of the disputed property.
 

 ¶ 18. Having found that the chancellor did not abuse her discretion when she found that the Niebancks had failed to demonstrate by clear and convincing evidence two of the elements essential to an adverse-possession case, there is no need to go further in the analysis. The Nie-bancks were obligated to demonstrate by clear and convincing evidence that each of the elements were met. The chancellor bore the responsibility of weighing the conflicting testimony, and there is substantial evidence to support her decision. We refrain from disturbing her decision. Accordingly, we affirm the chancellor’s judgment.
 

 ¶ 19. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. CARLTON, J. NOT PARTICIPATING.
 

 [1]
 

 . The Niebancks also named the banks that held deeds of trust on the two parcels of property. Merchants and Farmers Bank held the deed of trust on Dale’s property. First Tennessee Bank National Association held the deed of trust on the Wimses' property. The Niebancks later agreed to dismiss the banks from the litigation.