827 So.2d 27 (2002)
Yolanda A. GUTIERREZ, Appellant,
v.
Richard A. BUCCI, Appellee.
No. 2000-CA-01142-COA.
Court of Appeals of Mississippi.
September 24, 2002.
*29 William Lee Guice III, Maria M. Cobb, Biloxi, attorneys for appellant.
Earl L. Denham, Wendy C. Hollingsworth, Ocean Springs, attorneys for appellee.
Before SOUTHWICK, P.J., BRIDGES, and LEE, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. Dr. Richard Bucci was granted a divorce from Dr. Yolanda A. Guiterrez on the ground of adultery. Physical custody of the couple's two daughters was awarded to Dr. Bucci. Dr. Guiterrez appeals arguing that the chancellor erred as to custody and in classifying certain assets as being the separate property of Dr. Bucci. We find no reversible error and affirm.

STATEMENT OF FACTS
¶ 2. Richard Bucci and Yolanda Guiterrez were married in May 1987 in Mobile, Alabama. At first, the couple resided in New Orleans. Dr. Gutierrez had immigrated to the United States from her native Nicaragua in 1982. She received a medical degree from a university in Nicaragua before arriving in the United States. However, Dr. Gutierrez was unable to obtain a medical license in Louisiana. When the couple married, she was working as a medical assistant. Dr. Bucci had been a staff physician for eight years at Oschner Clinic in New Orleans and had also become a partner.
¶ 3. Dr. Bucci hired an attorney to facilitate his wife's obtaining of a Louisiana medical license. This was unsuccessful. The couple relocated to Mobile, Alabama in 1988 so that Dr. Gutierrez might obtain her medical license and begin a medical residency at the University of South Alabama. Dr. Gutierrez arrived in Mobile in *30 July 1988. The next month, the couple's first child, Johana, was born. A few months later, Dr. Bucci left Oschner and relinquished his partnership interest. After moving to Mobile, Dr. Bucci was employed full-time at Providence Hospital in Mobile and part-time at Singing River Hospital Systems in Pascagoula, Mississippi. In 1989, Dr. Bucci began full-time employment as an emergency room doctor at Singing River.
¶ 4. Dr. Gutierrez completed her residency in 1991. The couple then moved to Pascagoula in 1992. The couple's second child, Carolina, was born in February 1993. In June 1996, Dr. Gutierrez began working full-time at a children's clinic in Pascagoula.
¶ 5. In either December 1995 or January 1996, Dr. Gutierrez met Keith Cooper at a video store. Sometime thereafter, they began having an affair. Dr. Gutierrez took Cooper on a trip to California in the spring of 1997. Dr. Gutierrez asserted that the affair ended later that year.
¶ 6. At some point, Dr. Bucci discovered the affair. He filed for divorce on the ground of adultery on October 24, 1997. Dr. Gutierrez counterclaimed and alleged habitual cruel and inhuman treatment or alternatively sought a divorce based on irreconcilable differences. Under a temporary court order, custody of the two children alternated between the parents each week. The children remained in the marital home and each parent moved in and out as custody changed.
¶ 7. After two hearings in January and May 1998, Dr. Gutierrez was found in contempt of court. The first hearing concerned Dr. Gutierrez's violation of the temporary custody order. Dr. Gutierrez often returned the children to Dr. Bucci after the time designated by the court. She also did not vacate the marital residence when Dr. Bucci was to have the children. The second hearing dealt with Dr. Gutierrez's refusal to provide Dr. Bucci with access to a second home that she had purchased at about the time of the filing of the divorce. The court required Dr. Gutierrez to provide Dr. Bucci with a key to the new home. Dr. Gutierrez also placed a lock on the door to the master bedroom.
¶ 8. Hearings concerning the divorce were held between June 1998 and May 1999. Numerous witnesses were called by both parties. More than eighty exhibits were entered into evidence.
¶ 9. Judgment was entered on December 1, 1999. Dr. Bucci was granted a divorce on the ground of adultery. He was awarded primary physical custody of the children, and Dr. Gutierrez was allowed visitation. Dr. Gutierrez was ordered to pay child support.
¶ 10. Dr. Gutierrez filed a motion to require the chancellor to issue findings of fact and conclusions of law to support his judgment. On June 30, 2000, the chancellor issued his sixty-six page findings of fact and conclusions of law. Dr. Gutierrez's notice of appeal was filed shortly thereafter.

DISCUSSION
¶ 11. Dr. Gutierrez asserts on appeal that the chancellor erred in granting Dr. Bucci physical custody of the children, erred by not ordering Dr. Bucci to pay child support, and erred in classifying certain properties as being Dr. Bucci's separate property. Because we uphold the decision to award custody to the father, we do not discuss the issue of whether the father should pay child support had we reversed that custody determination.

1. Custody
¶ 12. In matters of child custody, this Court employs a limited standard of *31 review. Which parent should be awarded primary custody is determined by reference to identified factors. Lee v. Lee, 798 So.2d 1284, 1288 (Miss.2001). The decision of the chancellor as to the placement of the child will only be reversed if manifestly wrong, clearly erroneous, or arrived at by application of an erroneous legal standard. Williams v. Williams, 656 So.2d 325, 330 (Miss.1995).
¶ 13. There is at least one circumstance where this Court does not accord the chancellor the usual level of deference. "Where the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care and the evidence is subjected to heightened scrutiny." Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995). Dr. Gutierrez asserts in her brief that the chancellor adopted the "factually inaccurate proposed findings of fact and conclusions of law submitted ..." by her now exhusband's attorney. It is true that the chancellor invited proposed findings of fact and conclusions of law from both parties. However, the proposals were not made part of the appellate record. We have no meaningful way to evaluate Dr. Gutierrez's assertion. Thus, we will grant the chancellor's findings the usual level of deference.
¶ 14. We examine the challenges made by Dr. Gutierrez to the chancellor's findings.

a. Age, Health, and Sex of the Children
¶ 15. The chancellor found this factor to weigh slightly in favor of Dr. Gutierrez. At the conclusion of the hearings, Johana was ten years old; Carolina was six years old. The chancellor found that since both children were in excellent health, that health did not affect custody. The chancellor found that as both children were girls, this favored custody by their mother. The chancellor also found that the children were not of tender age and related well to both parents.
¶ 16. Dr. Gutierrez asserts that the children were of tender age and that the "tender years" doctrine presumes that she as the mother is better suited to raise two young girls. That doctrine holds that "`[i]n all cases where any child is of such tender age as to require the mother's care for its physical welfare it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons.'" Law v. Page, 618 So.2d 96, 101 (Miss.1993).
¶ 17. An older decision stated that "this Court has continuously held that if the mother of a child of tender years especially a femaleis so fit, then she should have custody." Buntyn v. Smallwood, 412 So.2d 236, 238 (Miss.1982). Later, though, the Supreme Court held that the tender years doctrine only created a rebuttable presumption. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). Even if the children are of the age to which the tender years doctrine might apply, the doctrine "is but one factor out of many to be considered in a child custody case." Blevins v. Bardwell, 784 So.2d 166, 173 (Miss.2001). Children who are seven years or older are "long past the age prior to which it requires attention of such character from the mother." Torrence v. Moore, 455 So.2d 778, 780 (Miss.1984).
¶ 18. The chancellor's evaluation of this factor was not clearly erroneous.

b. Continuity of Care Prior to Separation
¶ 19. The chancellor found that this factor favored Dr. Bucci. The chancellor *32 stated that "[w]hether or not it was the case earlier during the marriage, the evidence clearly establishes [Dr. Bucci] had provided continuity of care of the minor children prior to the separation of the parties for a significant period of time and was the primary caregiver at the time the parties separated." Dr. Gutierrez's argues the evidence was not so clear. She had testified that she was the primary caregiver and that Dr. Bucci was "never around and generally had no time to spend with the family."
¶ 20. Evidence came in part from a witness whose testimony Dr. Gutierrez complains should not have been given much weight. Amada Ecury was employed as a nanny for the children from March to August 1997. What weight and credibility to be given her evidence is for the chancellor, not for an appeals court. Rogers v. Morin, 791 So.2d 815, 826 (Miss. 2001). Because of the long hours worked by both parents, the couple employed several nannies during their marriage. Dr. Gutierrez argues that had either parent been able to spend much time with the children, no nanny would have been needed. From this observation, Dr. Gutierrez appears to argue that neither she nor Dr. Bucci could be considered the primary caregiver; the nanny was. However, what is being compared is the care provided by the parents. That a third party, whether a nanny or a day care center, was also involved does not obliterate the need to make this comparison between the parents. It is possible that in some marriages neither parent provides relevant care. That does not seem the case here.
¶ 21. Ecury usually resided with the family for five days each week and would also stay in the household on the weekends if both doctor parents were working. Ecury testified that Dr. Bucci spent more time with the children than did Dr. Gutierrez. Ecury stated that this was because Dr. Bucci's schedule would allow him to work three or four days and then have the same number of days off. She testified that Dr. Bucci took the children swimming, to parks, on vacation, and on other activities, while Dr. Gutierrez's schedule prevented her from participating. If Ecury was unable or did not take the children to various activities, Dr. Bucci usually did so.
¶ 22. We do not examine each statement by Ecury that is challenged by Dr. Gutierrez. As just one example, Dr. Gutierrez disagrees that she allowed the children to have their way or that they usually cried when she was with them in order to manipulate her. Dr. Bucci allegedly did not allow such behavior. The evidence was conflicting and there is support for the chancellor's various findings.
¶ 23. There is also a complaint about the chancellor's reliance on certain testimony to reach the following conclusion about Dr. Gutierrez's admitted affair: "Testimony, particularly that of Mrs. Ecury, established that Yolanda spent her time off with Mr. Cooper rather than with the children." Dr. Gutierrez argues that this is a misstatement of fact since Ecury stated that though she believed that Dr. Gutierrez was having an affair, she was not certain. First, this finding was not made under the continuity of care factor but under the moral fitness factor discussed below. The finding is also taken out of context. Ecury's testimony was that Dr. Gutierrez did not spend much of her time off with the children. Other testimony, including that of Dr. Gutierrez, established that she spent time with her paramour and not her children. We find no error on this point.
¶ 24. One witness who was present just about every day at the private school that the children attended, testified that she saw Dr. Bucci at the school with the *33 children more often than she saw Dr. Gutierrez. She described once seeing Dr. Gutierrez go to one of the children's classrooms, staying briefly, and then leaving. That witness then saw the child sitting in her teacher's lap and crying. She did not know what had happened. That was an ambiguous incident that was presented as such.
¶ 25. The overall testimony supports the chancellor's finding that although Dr. Gutierrez was more involved with the children during the early part of the marriage, that her involvement declined with the advent of her affair and that Dr. Bucci became the primary caregiver.

c. Best Parenting Skills, Willingness and Capacity to Provide Primary Care
¶ 26. Dr. Gutierrez argues the chancellor's findings on this factor "do not accurately summarize the testimony of the witnesses at trial." Dr. Gutierrez asserts that the chancellor ignored the favorable testimony both of a neighbor Mamie Futch, and of Pam Larson, a licensed practicing nurse who worked for Dr. Gutierrez. The chancellor discussed the testimony of both of these witnesses in his findings and noted that they were quite favorable towards Dr. Gutierrez.
¶ 27. Even so, the chancellor found that this factor favored Dr. Bucci. The chancellor noted that Dr. Gutierrez testified that Keith Cooper forced his way into her house demanding a prescription painkiller. Dr. Gutierrez testified that she thought Cooper had a gun with him. Cooper made Dr. Gutierrez drive to Mobile and obtain a prescription. Dr. Gutierrez never reported this incident to the authorities and stated at trial that she did not believe Cooper to be a "bad person" or a "criminal" but just someone that "was having a bad time at the time...."
¶ 28. The chancellor found that Dr. Gutierrez routinely violated the visitation order by bringing the children home late or not vacating the marital residence when she was required. Dr. Gutierrez entered the marital residence during the weeks that Dr. Bucci was residing there. Dr. Gutierrez also entered the marital residence when she was not to be there in order to take pictures of the home and of Dr. Bucci's living area. Dr. Gutierrez removed the children's clothing from the marital residence and refused to pack the children's clothes during the weekly changes of custody because she said that it was too much trouble. Dr. Gutierrez also removed the children's furniture from the residence despite that she had bunk beds for the children at her home. Dr. Gutierrez's violation of his orders placed the children "under great stress and clearly ignor[ed] their welfare."
¶ 29. The chancellor found that Dr. Gutierrez did not save for the children while Dr. Bucci did. Dr. Gutierrez claimed to have spent all of her income on the household and the children. However, Dr. Gutierrez testified at trial that she had saved some money for her children but withdrew those funds. She could not recall on what she had spent those funds.
¶ 30. The chancellor's findings on this factor were not clearly erroneous.

d. Responsibilities of each Parent's Employment
¶ 31. The chancellor found this factor to be neutral. The work schedules of each doctor "could be compatible with their children's routines." Dr. Gutierrez asserts that her schedule would allow her more time with the girls each evening and on the weekend. Dr. Gutierrez argues that Dr. Bucci's schedule requires him "periodically [to] be away until late in the evening and *34 over night." However, Dr. Gutierrez's schedule requires the same of her. We find no error.

e. Physical and Mental Health
¶ 32. This factor was found to favor Dr. Bucci. The chancellor found that Dr. Gutierrez took prescription medication other than Loritab for back pain, that the evidence was "highly suggestive" that she developed an addiction to Loritab, and that she admitted that she self-prescribed Ambien. We examine these findings.
¶ 33. Dr. Gutierrez testified that she took Loritab for back pain. She testified that one of Dr. Bucci's co-workers, who was a neurosurgeon, diagnosed her with a bulging disk in her back and "put her on medication for that...." Whether this medication was Loritab or another drug is unclear.
¶ 34. At one point, Dr. Gutierrez denied having self-prescribed Loritab. At another hearing, Dr. Gutierrez testified that she could not recall if she had ever self-prescribed Loritab. Later at that hearing, she stated that "I believe I have." She admitted that she prescribed Loritab for her mother under both her name and her mother's name; for her paramour, Keith Cooper, using the name "Rosa Gonzalez"; and also for her sister. There was no testimony indicating that either of Dr. Gutierrez's family members had medical conditions requiring Loritab. Cooper testified and was asked several questions about his and Dr. Gutierrez's use of Loritab. To each inquiry, Cooper invoked his Fifth Amendment right against self-incrimination.
¶ 35. Pharmacy records introduced at trial indicated that Dr. Gutierrez self-prescribed Loritab, Paxil, and hydrocodone, a generic form of Loritab. Dr. Bucci testified that he refused to bring home any more sample packs of Loritab and Lorcet after he noticed that those packs were disappearing. Dr. Bucci testified that he also had experienced pain from a bulging disc and had used Loritab.
¶ 36. The chancellor erroneously found that Dr. Gutierrez admitted that she self-prescribed "Ambien," a sleeping pill. The only reference to Ambien is from Dr. Bucci. He testified that Dr. Gutierrez once asked him to pick up an Ambien prescription for her. We find no significance to this factual error as to the self-prescribing of Ambien, since the larger problem expressed in the findings was Dr. Gutierrez's possible misuse of Loritab. Both Dr. Bucci and Dr. Gutierrez underwent drug tests whose results were negative for the drugs tested.
¶ 37. The evidence raised concerns about Dr. Gutierrez's possible misuse of Loritab. The chancellor had to make a decision on each factor based on the evidence before him, some of which was inconclusive. We find no error in this factor being weighed in favor of the father.

e. Moral fitness
¶ 38. Dr. Gutierrez asserts that the moral fitness factor took the "lion's share of the chancellor's attention" and that she was unfairly penalized for her affair with Keith Cooper. Marital infidelity cannot be used as the sole basis for denying physical custody to the offending parent. McKee v. Flynt, 630 So.2d 44, 49 (Miss.1993). However, the chancellor stated that Dr. Gutierrez's "behavior throughout gives the Court serious concern about her moral fitness."
¶ 39. Dr. Gutierrez asserts that her affair was her only act of moral indiscretion during the marriage. She claimed that she met Keith Cooper in late 1995 or early 1996 and that their relationship did not *35 become sexual until mid-1996. She stated that she expressed great remorse for the affair. Dr. Bucci testified that Dr. Gutierrez never apologized to him; Dr. Gutierrez corroborates that. She testified that though Dr. Bucci knew of the affair that he "never talked to me about it which is what I would have expected a caring husband to do." She also asserted that Dr. Bucci "does everything always behind my back." It was only after Dr. Bucci had filed for divorce that Dr. Gutierrez claims to have made any attempt to discuss with Dr. Bucci and apologize for the affair.
¶ 40. To show her husband's alleged moral unfitness, Dr. Gutierrez claimed that he kept a large amount of pornography in the house. He would leave Playboy magazines in common areas where the children could easily see them, and kept a large stack of them in a room that he used as his office. She also testified that Dr. Bucci had a large box full of pornographic movies easily accessible by the children and that these movies were sometimes left by Dr. Bucci in the videocassette recorder where the children could have seen them.
¶ 41. Dr. Gutierrez offered into evidence two issues of Playboy magazine and also two pornographic videos. The jacket of each video was said to have extremely graphic photographs of adults engaged in various sexual activities. Also introduced was a pornographic catalog that Dr. Bucci had ordered and had sent either to his office or to his mother's home in Mobile.
¶ 42. What apparently was found to damage Dr. Gutierrez's credibility on the details of many incidents was that she offered photographs that she had taken that purported to show numerous magazines and videos lying about the marital residence. On careful questioning after an initial denial, Dr. Gutierrez admitted that she had staged the photographs. The only videos clearly depicted in the photographs were the two entered into evidence. She also admitted that these were the only pornographic videos that she could find; therefore, a photographed cardboard box that allegedly and openly contained many more such videos was not what it was first said to be.
¶ 43. Dr. Gutierrez admitted that she took these two videos from Dr. Bucci's locker at the hospital and placed them in the home for the purpose of producing her photographs. These two videos were the only ones that she could find, but she asserted that Dr. Bucci at one time had a collection of more than twenty. Dr. Bucci admitted that the videos were his but denied that they ever were in the house. Dr. Bucci testified that he owned only those two videos introduced into evidence.
¶ 44. When first asked about the photograph of the Playboy magazines and their peculiar arrangement, Dr. Gutierrez stated that she found them in that way in the home. Later she admitted to having spread them out and having arranged them so that the title could be seen in the picture. Dr. Gutierrez admitted to rearranging both the magazines and videos several times in order to take additional photographs. She claimed it was necessary to rearrange the magazines and videos because while she was taking the photographs she "heard one of my daughters calling me and I had to hide everything." Dr. Gutierrez claimed that she was attempting to demonstrate to the court what the house looked like before Dr. Bucci removed all of the videos.
¶ 45. Dr. Gutierrez also claimed that Dr. Bucci left adult materials all over the house. However, both a nanny and one of Dr. Gutierrez's nurses, who were frequently in the house for baby sitting and other reasons, stated that they had not seen any adult videos or magazines lying around the house. Another witness testified that she *36 had seen a particular magazine, but her credibility was undermined when the specific magazine that she allegedly saw was published over a year after she last worked for the family.
¶ 46. There were other alleged incidents which were part of Dr. Gutierrez's effort to portray her husband as overcome with the need to view pornography. The chancellor found most of the evidence presented on this point to have been discredited. Dr. Bucci did admit to viewing pornography, but denied that it was to the degree that his wife asserted. He also denied having such materials at the house or in other locations where his daughters could see them. The chancellor accepted that testimony, and we find no error in that choice.
¶ 47. Dr. Gutierrez takes issue with two other findings regarding her character. The first is that she admitted to using marijuana at some time in the past. The other statement is that prior to the birth of their first daughter, that Dr. Gutierrez and her husband used illicit drugs and viewed adult movies together. Though Dr. Gutierrez denied that she smoked marijuana, she did admit at one hearing that before she and her husband were married, that they used "recreational drugs" on one occasion. The chancellor said that he would not consider anything that either party did before the marriage. Thus, the chancellor's finding concerning marijuana was erroneous. In the totality of the evidence underlying this factor, the error was inconsequential. As to the other contested finding here, Dr. Gutierrez admitted to having watched adult movies with Dr. Bucci.
¶ 48. The chancellor's discussion of moral fitness did not dominate his conclusions. Some minor errors in the findings were made. After reviewing the nearly one thousand page transcript and the chancellor's sixty-six page findings of fact and conclusions of law, we find it clear that Dr. Gutierrez's affair with Keith Cooper was not the sole reason that she was denied custody. Other findings in the chancellor's written opinion could apply to this factor as well. The chancellor noted Dr. Gutierrez's general unreliability, such as her testimony concerning Loritab, the photographs purporting to demonstrate Dr. Bucci's penchant for pornography, misrepresentation of her income, and refusal to cooperate in discovery as to her financial status. Dr. Gutierrez refused to produce certain financial records such as checks, bank statements, and credit card statements relating to the time period in which she was involved with Keith Cooper.
¶ 49. This factor was properly found to weigh in favor of Dr. Bucci.

f. Stability of the Home Environment
¶ 50. The chancellor found that from "the entirety of the evidence it is obvious that the environment in Richard's home would be much more stable than Yolanda's." The chancellor based this conclusion on Dr. Gutierrez's refusal to comply with court orders concerning custody, the children's clothing, use of the home she had purchased, and harassment of Dr. Bucci. The chancellor found that Dr. Bucci had done what he could to promote harmony between the children and their mother. The chancellor noted that Dr. Gutierrez's "disregard of this Court's orders, her erratic and obsessive behavior, and her flagrant and continuous harassment of Richard have exposed her daughters to the very scenes from which this Court sought to protect them."
¶ 51. The chancellor mentioned that Dr. Jane Cook, a clinical counselor, gave her opinion that each parent had a strong emotional tie with the children and that they should have an equal role in the lives of *37 the children. While Dr. Cook may have been designated by the chancellor as an expert, that designation did not obligate the chancellor to adopt her position as to the awarding of custody.
¶ 52. We cannot say that the chancellor's finding on this factor was clearly erroneous.
¶ 53. The overall conclusion that it was in the best interest of the children to award custody to the father is supported by this evidence. We affirm the custody decision.

2. Division of Property
¶ 54. A chancellor's decision concerning the distribution of marital assets will not be disturbed unless such a decision is clearly erroneous, manifestly wrong, or arrived at through the application of an erroneous legal standard. Franks v. Franks, 759 So.2d 1164, 1166 (Miss.1999). The chancellor properly began by classifying the properties of each spouse as either marital or non-marital. Franks, 759 So.2d at 1166. The chancellor then employed factors enumerated by the Supreme Court to arrive at an equitable distribution of the marital property. Id. With the standard of review in mind, we look to the chancellor's classification of certain properties.

a. Harley-Davidson Motorcycles
¶ 55. During the marriage, Dr. Bucci purchased three Harley Davidson motorcycles. The total value of the motorcycles was $23,190.00. The chancellor classified two of the motorcycles, a 1983 Harley Sturgis and 1997 FXWG Harley, having a total value of $17,155, as being the separate non-marital property of Dr. Bucci. This classification was based on the fact that the two motorcycles were purchased purely with funds from a retirement account established by Dr. Bucci before his marriage to Dr. Gutierrez. Dr. Bucci did not contribute funds to this particular account during the marriage. The chancellor classified the remaining motorcycle, a 1996 Harley Sportster, as marital property as the testimony revealed it was purchased with funds both from the retirement account and from the couple's joint checking account. Even so, the chancellor also awarded the third motorcycle to Dr. Bucci as part of his distribution of marital assets.
¶ 56. Dr. Gutierrez argues that the two motorcycles are marital property because they were acquired during the marriage. She argues that she is entitled to exactly half the value of three motorcycles or $11,995. If property is obtained during marriage by the use of assets attributable to one's separate estate prior to marriage, then the property may retain its character as separate property. Arthur v. Arthur, 691 So.2d 997, 1002 (Miss.1997).
¶ 57. Dr. Gutierrez argues that the first two motorcycles became marital property because she would use them on occasion. We do not find that occasional riding of one of the motorcycles by the nonpurchasing spouse necessarily causes the separate property to lose that classification. This Court recently concluded that even when the marital home was purchased during the marriage with funds attributable to one spouse's pre-marital estate, it may retain its non-marital character at least when the joint use is not long-term. Wilson v. Wilson, 820 So.2d 761 (¶ 6) (Miss. Ct.App. 2002).
¶ 58. As to the 1983 Harley Sturgis and 1997 FXWG Harley, Dr. Bucci paid for them exclusively with funds accumulated prior to his marriage. The classification of those two motorcycles as the separate nonmarital property of Dr. Bucci was correct. The third motorcycle was classified as a marital asset, but awarded to the husband. *38 We find no error that in awarding marital assets, that consideration is given to the primary user of those assets. That was Dr. Bucci, and his receipt of the third bike despite that the other two were to be his as well was not error in itself, if the overall marital property distribution was equitable.

b. Edgewater Drive Lots
¶ 59. Dr. Bucci was at one time a shareholder with two other physicians in a corporation known as Sandpiper, Inc. The corporation was formed by Dr. Bucci and two other physicians to purchase and hold properties. Two of those properties were located on Edgewater Drive in Ocean Springs, Mississippi. The funds invested by Dr. Bucci in Sandpiper, Inc. came solely from the sale of properties Dr. Bucci owned in New Orleans acquired and paid for prior to his marriage to Dr. Gutierrez. The corporation was later dissolved and Dr. Bucci received the two Edgewater Drive properties. Dr. Bucci's financial statement listed these two Edgewater Drive properties as having an estimated aggregate value of $85,000.
¶ 60. Dr. Gutierrez argues that these properties should not have been classified as her husband's separate property. She argues that because Dr. Bucci used marital funds to make the mortgage payments on them, that they became marital property by virtue of commingling.
¶ 61. Dr. Bucci disputes this as a factual matter by saying in his brief that the two Edgewater Properties did not carry mortgages. However, a financial statement filed by Dr. Bucci with the chancery court lists these two properties as having mortgages aggregating approximately $80,647.00. The payment on each mortgage is listed as $466.29, for a total of $932.58 per month. Dr. Bucci testified at a 1999 hearing that he had been paying for the mortgages on these properties out of his salary since mid-1998.
¶ 62. The chancellor should not have classified the Edgewater Drive properties as being the separate non-marital property of Dr. Bucci. That is because Dr. Bucci used marital funds to pay the mortgages. That changed their character from nonmarital to marital. Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss.1994). The chancellor properly noted as to other investment property that Dr. Bucci used marital funds to pay those mortgages. As to that other property, however, the chancellor found that because Dr. Gutierrez wasted a substantial amount of marital assets, that Dr. Bucci's use of marital funds for the mortgage payments could be overlooked. The chancellor specifically found that Dr. Bucci used marital funds to pay the mortgage payment of $1,200 on a house he received from the Sandpiper dissolution until the house was sold. The chancellor found the total of these payments to total approximately $6,800.
¶ 63. The dissipation of assets finding is derived from evidence such as the following. After the couple separated, Dr. Gutierrez bought a house with marital funds worth $195,000. Included in that amount was approximately $80,000 that she spent either on the residence or its furnishings. A portion of those funds came from her withdrawal of retirement funds which were accumulated during the marriage, totaling approximately $44,500. Dr. Gutierrez also traded in a 1997 Lexus for a 1999 Lexus. She received $38,000 on her trade-in but ended the transaction owing $48,000 on a $55,000 vehicle. Dr. Gutierrez's financial disclosure statement listed her 1997 Lexus as having equity of $10,000. and an outstanding loan of $40,000 attached to it.
¶ 64. The chancellor noted that Dr. Gutierrez's income at the time of the final hearing was approximately $173,000, but *39 that she had accumulated little or no savings, had consumed what she had saved, and had also incurred a considerable debt. It was Dr. Gutierrez's contention that the majority of her income was used to buy clothes for the children, pay household expenses, and purchase groceries for the family. The evidence did not support this. The chancellor noted that Dr. Gutierrez leased a Ford Explorer for Keith Cooper and made some lease payments on his behalf. A rough approximation of the amount of marital funds spent on Mr. Cooper cannot be made because Dr. Gutierrez never produced copies of all her bank and credit card statements. Approximately $14,700 was loaned or given to members of Dr. Gutierrez's family. She claimed that the loan had been repaid but produced no documentation of any payments received.
¶ 65. Returning now to the misclassified Edgewater Drive properties, we find that the chancellor's reasoning for excusing the expenditure of marital funds for the Sandpiper house applies equally well to the Edgewater Drive tracts. Considering the market value of the latter properties and their mortgages, the net value is only $5,000. The chancellor found that Dr. Gutierrez wasted considerably more marital assets than that.
¶ 66. Equitable distribution of marital assets does not mean equal distribution. Owen v. Owen, 798 So.2d 394, 399 (Miss.2001). The chancellor considered all relevant factors and made specific findings on the record. Regardless of what label the chancellor may have placed upon the Edgewater Drive properties, his decision, based on the record in this matter, to award those properties and to assign the attached debts to Dr. Bucci was not clearly erroneous.
¶ 67. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, CHANDLER AND BRANTLEY, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. MYERS, J., NOT PARTICIPATING.