997 So.2d 983 (2008)
DEPARTMENT OF HUMAN SERVICES, State of Mississippi and Ruby J. Murphy, Appellants
v.
Henry RAY, Appellee.
No. 2007-CA-00362-COA.
Court of Appeals of Mississippi.
December 16, 2008.
*985 Tamekia Rochelle Goliday, Peter Joseph Bagley, attorneys for appellants.
Howard Q. Davis, Belzoni, attorney for appellee.
Before LEE, P.J., ROBERTS and CARLTON, JJ.
CARLTON, J., for the Court.
¶ 1. This case comes before the Court from the order of the Chancery Court of Sunflower County granting Henry Ray's motion for the reimbursement of child support on the basis of fraud. The chancellor ordered the Mississippi Department of Human Services (DHS) and Ruby J. Murphy (collectively the "Appellants")[1] jointly and severally liable to Ray in the amount of $23,183.10, representing the child support payments that Ray made to Murphy through DHS for approximately nineteen years for Murphy's child, L.J.[2] The Appellants raise numerous issues on appeal. However, we find it necessary to only address the following issue: Whether the chancellor erred when she entered a judgment against the Appellants for child support payments that Ray made on the basis that Ray was defrauded into believing that he was L.J.'s father.
¶ 2. While we understand the chancellor's frustration over disputed paternity cases such as this one, we find that Ray not only failed to prove fraud, but also, he failed to prove his claim of fraud would not be time-barred by the statute of limitations for fraud. Therefore, we reverse the judgment entered by the chancellor and render judgment in favor of DHS and Murphy.

FACTS
¶ 3. Murphy and Ray were involved in a romantic relationship that lasted approximately two years. During their relationship, Murphy became pregnant. Ray testified that Murphy told him that she became pregnant when a condom had burst when she and Ray were having sex. Ray testified that he did not remember any condom bursting during their relationship and did not believe that any ever had. Murphy gave birth to L.J. in December 1985. Shortly thereafter, Ray and Murphy ended their relationship. In January 1986, Murphy presented DHS with an executed affidavit and affirmation of paternity naming Ray as L.J.'s father. DHS then contacted Ray, who executed a stipulated agreement of support and admission of paternity and agreed to pay $100 per month in child support. Ray also agreed to provide health-care coverage and medical support for L.J.
¶ 4. Ray made child support payments to Murphy through DHS for approximately nineteen years until a friend suggested that he was not L.J.'s father. Consequently, in January 2005, Ray filed a petition for genetic testing, which the chancellor granted. The genetic test results excluded Ray as L.J.'s natural father. Ray then filed a petition to terminate child support. A *986 hearing was held on this petition. At the conclusion of the hearing, the chancellor terminated Ray's child support obligation and admonished Murphy, stating:
It's your responsibility to know. If you're going to practice sex with a lot of different people, it's your responsibility to know who the father is or to find out the truth. I'm going to grant this relief and I'll probably grant some more if they ask me for it.
....
And if you've got some friends that have done this you can tell them I'm fixing to start putting judgments on you women that name men to be the father and they're not the father.
¶ 5. Ray later filed a "motion to reimburse funds," seeking reimbursement from the Appellants in the amount of $23,183.10 for child support payments that he made over the previous nineteen years. A hearing was held on Ray's reimbursement motion. After hearing the arguments of counsel (no witnesses were called), the chancellor granted Ray's motion for reimbursement, stating:
And above all things this is a court of equity, and certainly what happened to [Ray] was not equitable. The mother perpetrated a fraud on [Ray] and was allowed to do so by [DHS], and this Court is going to grant the motion ordering [Murphy] and [DHS] to reimburse [Ray] in the amount of $23,183.10 and a judgment in that amount is granted.
¶ 6. The chancellor later entered an order memorializing her bench ruling. The parties then filed the following motions: (1) Murphy filed a motion for reconsideration or, in the alternative, a motion for findings of fact and conclusions of law; (2) DHS filed a motion for reconsideration and/or to set aside the order to reimburse funds; and (3) Ray filed a motion to amend his motion to reimburse funds to specifically plead fraud. The chancellor granted the Appellants' motions for reconsideration and granted Ray's motion to amend.
¶ 7. At the reconsideration hearing, Murphy testified that during her relationship with Ray, she had sex one time with a man named Johnny Lloyd.[3] According to Murphy, she believed that Ray was L.J.'s father because she regularly had sex with Ray over the course of their two-year relationship, sometimes without a condom. Murphy testified that she believed that Ray was L.J.'s father until the results of the 2005 paternity test proved otherwise.
¶ 8. As for Ray's belief regarding L.J.'s paternity, Ray made five explicit admissions during his testimony that he seriously doubted L.J. was his son both before and after L.J.'s birth. Ray also made three explicit admissions that he never seriously doubted L.J. was his son. Additionally, Ray testified during cross-examination by Murphy's attorney, Tamekia Goliday, that Murphy told him she had become pregnant because a condom had burst when they had sex. Ray testified as follows:
Goliday: So, if you can't remember if the condom burst, can you remember if you used one?
Ray: Naw, she the one said dat [sic] she the one said dat [sic] it burst. I didn't say this. Dat [sic] was her.
Goliday: So you didn't believe it burst?
Ray: No.
Goliday: Then why didn't you just go ahead and object to the DNA test?
Ray: Object to it?

*987 Goliday: I mean, why did you sign the petition agreeing to pay child support?
Ray: Because the judge just told me if I didn't sign I was going to jail.
Goliday: The judge told you that
Ray: I mean, not the judge. I'm getting it wrong.
Goliday: Okay.
Ray: It was the child support worker.
¶ 9. Ray also testified on direct examination to his attorney, Howard Davis, that on the day that he signed the stipulated agreement of support and admission of paternity, he told DHS workers that he did not believe that he was L.J.'s father. Ray testified as follows:
Davis: Did you make any comments to [DHS] while [Murphy] was sitting there about being the father of the child?
Ray: Yes, sir. I said I don't [sic] think I was the father of that child.
Davis: Was [Murphy] there at the time?
Ray: Yes, sir.
Davis: But at [DHS] you told them you didn't think you were the father?
Ray: Yes, sir.
Davis: And what, if anything, did they tell you at that point?
Ray: They told me she saying [sic] you [sic] the father, so we're gonna have to take her word on it, you know. They also asked me had I slept with her. I told them yeah, and I told them I had used protection at the time.
Davis: Okay. Did they tell you anything else?
Ray: No, no more than if I didn't sign those papers they was [sic] going to have the sheriff to pick [sic] me up.
Davis: If you didn't sign those papers, what were they going to have the sheriff pick you up for?
Ray: For child support.
Davis: Is that why you signed the papers?
Ray: Yes, sir.
Davis: Did you believe at the time that you were the father of the child?
Ray: No, sir.
¶ 10. On cross-examination by Byron Hughes, the attorney representing DHS in the matter, Ray testified to the following:
Hughes: Any day out of those nineteen years you could have walked in that child support office and say [sic] I want a paternity test. Why didn't you do it?
Ray: I did.
Hughes: You did?
Ray: Yes, sir.
Hughes: When did you do it?
Ray: I did it to them. They told me I had to get an attorney, so
Hughes: That's true.
Ray: that's what I did. I just got it.
Hughes: In 2005. But this was done in 1986. What took you so long?
Ray: Well, I told you like I said I wasn't gonna take a chance of spending no [sic] money and not really knowing whether this was my child or not.
Hughes: But you spent money for nineteen years.
Ray: Well, I didn't really know nothing [sic] about legal action for [sic] as how much it was going to cost. I thought it was going to cost a lot of money for a lawyer, so I didn't risk that chance of
Hughes: So, you voluntarily paid your child support every month for that period of time?
Ray: Yes, sir.
¶ 11. Moreover, on redirect with his attorney, Davis, Ray testified again that he *988 did not believe L.J. was his son when he signed the paternity agreement. The transcript reveals the following exchange:
Davis: [Hughes] asked you if you believed all those years that L.J. was yours and Idid you really believe all those years that he was yours?
Ray: No, sir ...
Davis: Okay. And he asked you why you didn't havego hire an attorney. Did you have any money to hire an attorney back in 1986?
Ray: No, sir.
¶ 12. On recross-examination with Murphy's attorney, Goliday, Ray stated once again that he did not believe L.J. was his child when he was presented with the paternity agreement at DHS. Ray testified as follows:
Goliday: For that fifteen-year period [before 2000], you never questioned paternity?
Ray: No more than when I went in the first time.
Goliday: Okay. So let's talk about that. When you went in the first time, you said that you didn't believe that it was your child, is that correct?
Ray: Correct.
¶ 13. However, within a few moments of the above testimony, Ray testified that he did not doubt that L.J. was his child. The exchange was as follows:
Goliday: [S]o your testimony is you don't know if [the condom] broke or not? Is that correct?
Ray: That's correct.
Goliday: And so that would mean you always thought that was a possibility this was your baby?
Ray: Yes.
Goliday: Okay. And you never really questioned thatseriously questioned that possibility?
Ray: No.
¶ 14. Additionally, Ray admitted that he went to the DHS office voluntarily, and not under duress, after receiving correspondence from DHS regarding the paternity of L.J. The transcript provides:
Goliday: [Y]ou went to that DHS office voluntarily because you believed it was your baby?
Ray: No, I didn't go voluntarily `cause they wrote me a second letter to get me there.
Goliday: But I'm saying the sheriff didn't pick you up and take you over there, did he?
Ray: No. They didn't.
¶ 15. Again, when Hughes cross-examined Ray, Ray admitted he was not under duress when he went to DHS regarding the paternity of L.J., as the following exchange demonstrates:
Hughes: [B]ack in 1986 you and [Murphy] went to the child support office [and] signed papers that L.J. was your child, is that correct?
Ray: Yes, sir.
Hughes: And you voluntarilyhave already testified nobody made you go to that office, did they?
Ray: No, sir. Nobody made me went [sic].
Hughes: [Y]ou voluntarily signed the [admission of paternity]?
Ray: Yes, sir.
Hughes: Saying you were the father of L.J.?
Ray: Yes, sir.
¶ 16. Murphy and her case worker, Catherine Labella, were present when Ray signed the admission of paternity. Murphy testified that Labella told Ray that he could request a genetic test if he disputed paternity. Similarly, Beverly Bennett, a case worker for DHS testified that DHS *989 gives all fathers the option of genetic testing.[4] Essentially, Ray chose not to exercise his constitutional right to contest paternity when he was given the opportunity to do so and committed himself to paying child support for almost two decades.
¶ 17. At the conclusion of the reconsideration hearing, the chancellor again granted Ray's motion for reimbursement and ordered that the Appellants were jointly and severally liable for $23,183.10. The chancellor stated her reasoning from the bench as follows:
The mother's testimony is that [DHS] did not ask her when she went into the office to initiate these proceedings if she ever had sex with anyone else. The worker told her to get benefits she would have to sign an affidavit alleging who the father was. This Court does not think it is sufficient for [DHS] to take a mother's affidavit, pursue a man for child supportactively pursuing the man here[Ray], and then when the DNA results prove it negative, [DHS] claims no responsibility. This is a growing trend in this jurisdiction. If DHS is going to actively pursue child support then they either need to investigate more fully and/or provide DNA tests....
This Court is a [c]ourt of equity and there is nothing equitable about a man paying over $23,000 in child support for the benefit of a child that is not his. The Court finds that [Murphy] either knew that her statement was false or should have known that her statement was false when she named [Ray] as the father. [DHS] actively went along with that. The Court finds that [Murphy] with the assistance of [DHS] perpetrated a fraud on [Ray]. [DHS] and [Murphy] are liable for $23,183.10, together with all costs.
The chancellor later entered an order that memorialized her bench ruling. The Appellants now turn to this Court for relief.

STANDARD OF REVIEW
¶ 18. A chancellor's findings will not be disturbed on appeal "when supported by substantial evidence unless the chancellor abused his [or her] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002) (quoting Kilpatrick v. Kilpatrick, 732 So.2d 876, 880(¶ 13) (Miss.1999)). As an appellate court, our duty is to respect limitations where appeals arise regarding issues of fact. Tricon Metals & Servs., Inc. v. Topp, 516 So.2d 236, 239 (Miss. 1987). Our Court gives great deference to a chancellor's judgment "because he [or she] is in a better position to determine what action would be fair and equitable in the situation than a court of appellate jurisdiction." Turnley v. Turnley, 726 So.2d 1258, 1265(¶ 23) (Miss.Ct.App.1998) (citation omitted).
¶ 19. Here, the chancellor adopted in toto Ray's proposed findings of fact and conclusions of law, thus, triggering a heightened standard of review. It is within a chancellor's sound discretion to adopt verbatim the findings of fact and conclusions of law submitted by a party. Thomas v. Scarborough, 977 So.2d 393, 396(¶ 9) (Miss.Ct.App.2007) (citation omitted). However, "[w]here the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party ..., this Court analyzes such findings with *990 greater care and the evidence is subject to heightened scrutiny." Gutierrez v. Bucci, 827 So.2d 27, 31(¶ 13) (Miss.Ct.App.2002) (quoting Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss. 1995) (finding that the chancellor failed to make his own findings and in adopting litigant's findings, applied the wrong legal standard)). This Court has held that it is error for a chancellor to adopt a party's submission when the evidence does not reasonably support the chancellor's findings. Brooks, 652 So.2d at 1117-18 (citations omitted).

DISCUSSION
Whether the chancellor erred when she entered a judgment against the Appellants for child support payments that Ray made on the basis that Ray was defrauded into believing that he was L.J.'s father.
¶ 20. The Appellants argue that Ray was not entitled to reimbursement for past-due child support payments because they vested in L.J. as they became due and could not be forgiven. They also claim that the evidence failed to establish fraud. We agree. We find the evidence insufficient to support a finding of fraud by clear and convincing evidence. Moreover, Ray's claim of fraud is time-barred under the statute of limitations.

A. Ray is not entitled to reimbursement for past-due child support, absent a showing of fraud, because such payments are vested as they become due and cannot be forgiven.
¶ 21. The Appellants correctly cite McBride v. Jones, 803 So.2d 1168, 1170 (¶¶ 9-10) (Miss.2002) for the proposition that a non-biological father is not entitled to reimbursement from a child's biological mother for vested child support payments absent a showing of fraud. In McBride, the Mississippi Supreme Court held that a former husband was not entitled to reimbursement from his former wife for child support payments that he had made for fifteen years under the mistaken belief that he was the child's natural father. Id. at (¶¶ 7-10). In so holding, the court in McBride explained that "child support is for the benefit of the child and ... past-due child support payments cannot be modified or forgiven by any court because the parent's obligation of child support vests in the child when the payment becomes due." Id. at (¶ 9) (citing Williams v. Rembert, 654 So.2d 26, 29 (Miss.1995)).
¶ 22. Although McBride held that the non-custodial parent could not sue the natural mother for reimbursement, the court therein acknowledged that the non-biological father could either sue the natural father for reimbursement or the natural mother for fraud. Id. at (¶ 10). In accordance with McBride, we find that each month when the child support payments became due they vested in L.J., and Ray was not entitled to reimbursement absent a showing of fraud.

B. Ray failed to prove fraud by clear and convincing evidence.
¶ 23. In order to establish fraud, the burden is on the proponent to prove the following elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." Koury v. Ready, 911 So.2d 441, 445(¶ 13) (Miss.2005) (citing Mabus v. St. James Episcopal Church, 884 So.2d 747, 762(¶ 32) (Miss.2004)).
*991 ¶ 24. "[F]raud is never presumed and must be proved with clear and convincing evidence." Hamilton v. McGill, 352 So.2d 825, 831 (Miss.1977). "Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level." Moran v. Fairley, 919 So.2d 969, 975(¶ 24) (Miss.Ct.App.2005) (citation omitted).
¶ 25. We find that Ray failed to establish by clear and convincing evidence that he was defrauded by Murphy into believing that he was L.J.'s father. Murphy repeatedly testified that she believed that Ray was L.J.'s father at the time she executed the affidavit and affirmation of paternity and thereafter. Murphy testified that she had sex with Ray once or twice a week over the course of their two-year relationship, sometimes without a condom. Although Murphy admitted that she had sex one time with one other man during her relationship with Ray, she unequivocally testified that she believed Ray was L.J.'s father until the 2005 genetic test results proved otherwise.
¶ 26. More importantly, Ray testified that he did not believe Murphy's representation that he was L.J.'s father. For example, in contrast to Murphy's testimony, Ray testified that he and Murphy always used a condom when they had sex and that because of this practice, he never believed L.J. was his child. Similarly, Ray testified that he did not believe Murphy when she told him that a condom had burst during one of their sexual encounters, thus, causing her pregnancy. Ray also testified that when he was initially contacted by DHS regarding L.J., he told DHS that he did not believe he was the child's father. If Ray did not believe that he was L.J.'s father, then it defies logic to say that Ray reasonably relied on Murphy's representation that he was L.J.'s father.
¶ 27. Ray also testified that he never seriously questioned L.J.'s paternity. In fact, our review of the record reveals that Ray made five explicit admissions during his testimony that he had seriously doubted L.J. was his son. Ray also made three explicit admissions that he had never doubted L.J. was his son. It is difficult indeed to find that Ray's testimony rises to the standard of clear and convincing evidence in proving that he was defrauded by Murphy into believing that L.J. was his son. See Moran, 919 So.2d at 975(¶ 24).
¶ 28. Murphy and her case worker, Labella, were present when Ray signed the admission of paternity. When Ray signed the agreement of support and admission of paternity in January 1986, Ray had a constitutional right to have a paternity test performed and paid for by the State if he could not afford to pay for the test himself. See Little v. Streater, 452 U.S. 1, 16-17, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (stating that an indigent paternity defendant is constitutionally entitled to have the state pay the cost for blood-type analysis when there is a question of paternity). Murphy testified that Labella told Ray he could request a genetic test if he disputed paternity. Bennett, a DHS employee, testified that it is DHS's policy to offer genetic testing to all fathers. Additionally, the attorney for DHS stated at one hearing before the chancellor: "If a mother identifies an individual [as the father], the individual has two choices. He can ask for a blood test or he can admit [paternity]."
¶ 29. However, despite testifying that he did not believe L.J. was his son, for the various reasons stated throughout his testimony, Ray signed the agreement of support and admission of paternity. When asked about why he signed the admission of paternity, Ray testified that he had been raised alone by his mother and that he wanted to treat L.J. differently than his *992 own father had treated him. Ray stated: "My father never spent no [sic] time, didn't no [sic] raise me, didn't spend no [sic] money [on] me."
¶ 30. As to DHS, we find no evidence whatsoever that suggests that any DHS employee possessed any knowledge that Ray was not L.J.'s father. DHS had before it Murphy's affidavit, as well as a stipulated agreement of support and admission of paternity signed by Ray. There is simply no basis in the evidence to support the chancellor's finding that DHS perpetrated a fraud on Ray.
¶ 31. Again, although ordinarily a chancellor's findings are given great deference, in this case, because the chancellor adopted Ray's proposed order in toto, we must review her findings under a heightened scrutiny. See Gutierrez, 827 So.2d at 31(¶ 13). Under our case law, it is error for a chancellor to adopt a party's submission when the evidence does not reasonably support the chancellor's findings. See Brooks, 652 So.2d at 1117-18. Here, the chancellor erred in finding that Ray was defrauded into believing that L.J. was his son. Specifically, Ray failed to prove the following by clear and convincing evidence: (1) Ray was ignorant of the falsity of the allegation that he was L.J.'s father, and (2) Ray reasonably relied on Murphy's allegation that he was L.J.'s father. See Koury, 911 So.2d at 445(¶ 13) (providing the nine elements of fraud which must be proven in order to establish fraud). For the above reasons, we find that Ray's claim of fraud fails as to both Murphy and DHS.

C. Ray's claim of fraud is time-barred under the three-year statute of limitations for fraud.
¶ 32. The Court uses a de novo standard of review when reviewing statute of limitations issues. Stephens v. Equitable Life Assur. Soc'y of the U.S., 850 So.2d 78, 82(¶ 10) (Miss.2003) (citation omitted). Mississippi Code Annotated section 15-1-49 (Rev.2003) provides a three-year statute of limitations for claims of fraud. See Warren v. Horace Mann Life Ins. Co., 949 So.2d 770, 772(¶ 8) (Miss.Ct.App.2006) (citing Stephens, 850 So.2d at 82(¶ 12)). The three-year period begins to run when the cause of action accrues. Miss.Code Ann. § 15-1-49. The discovery rule applies so as to toll the statute of limitations only when the injured party is unaware of his injuries and the conduct that caused the injuries. Davis v. Hoss, 869 So.2d 397, 402(¶ 15) (Miss.2004). "The intent of the discovery rule is to protect plaintiffs who cannot, through reasonable diligence, discover injuries done to them." Forrest County Gen. Hosp. v. Kelley, 914 So.2d 242, 245(¶ 15) (Miss.Ct.App.2005) (citation omitted).
¶ 33. The Mississippi Supreme Court has stated:
The rule is that when, in respect to a matter in which [a man] has a material interest, a person has knowledge of such facts as to excite the attention of a reasonably prudent man and to put him upon guard and thus to incite him to inquiry, he is chargeable with notice, equivalent in law to knowledge, of all those further relevant facts which such inquiry, if pursued with reasonable diligence, would have disclosed.
First Nat'l Bank of Laurel v. Johnson, 177 Miss. 634, 643, 171 So. 11, 14 (1936) (citations omitted).
¶ 34. Murphy gave birth to L.J. in December 1985. In January 1986, Murphy presented DHS with an executed affidavit and affirmation of paternity naming Ray as L.J.'s father. Ray testified that he initially told DHS that he did not believe he was L.J.'s father. Murphy testified that her case worker told Ray that he could take a paternity test if he doubted *993 that he was L.J.'s father. Bennett, a DHS case worker, testified that it is DHS's policy to offer genetic testing to all fathers. See Little, 452 U.S. at 16-17, 101 S.Ct. 2202. If Ray had exercised his constitutional right to have a paternity test performed, the paternity test would have been conducted, and Ray would have been excluded as L.J.'s father. Instead, Ray chose, for variously stated reasons, to execute a stipulation of paternity and an agreement for support.
¶ 35. The statute of limitations for fraud is three years. Warren, 949 So.2d at 772(¶ 8). This period begins to run when the action accrues. Miss.Code Ann. § 15-1-49. Approximately twenty years have passed since Ray, according to his own testimony, had reason to believe that he was not L.J.'s father. See Johnson, 177 Miss. at 643, 171 So. at 14. Clearly, the statute of limitations has run on Ray's claim of fraud. Quite simply, Ray chose to sit on his rights. For the above reasons, Ray's claim of fraud is time-barred under the statute of limitations for fraud.

CONCLUSION
¶36. Ray contends that the chancellor was correct in granting his motion for reimbursement as a matter of equity. However, "equity follows the law." Davis v. Smith, 891 So.2d 811, 813(¶ 5) (Miss. 2005) (quoting In re Estate of Miller, 840 So.2d 703, 708(¶ 14) (Miss.2003)). Mississippi law regarding fraud and reimbursement of past-due child support is clearly defined, and the chancellor was bound to follow it. In sum, we find that there was insufficient evidence to establish fraud by clear and convincing evidence, and the chancellor's finding of fraud was clearly erroneous. Moreover, Ray's cause of action for fraud is time-barred under the statute of limitations of fraud. Therefore, we reverse and render as there is no basis for Ray to prevail in this case.
¶ 37. THE JUDGMENT OF THE CHANCERY COURT OF SUNFLOWER COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE, P.J., BARNES AND ROBERTS, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., CHANDLER AND ISHEE, JJ. IRVING, DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.
GRIFFIS, J., concurring in part and dissenting in part.
¶ 38. The majority reverses and renders this case. I respectfully concur in part and dissent in part.
¶ 39. I concur with the majority insofar as the Department of Human Services of the State of Mississippi ("DHS") should have no obligation to Henry Ray except for the portion of the child support payments that he made which were retained by DHS, if any. This issue should be reversed and remanded for the chancellor to consider what amount, if any, DHS may owe Ray.
¶ 40. I dissent from the majority's decision to reverse and render the case against Ruby J. Murphy. I believe that there was sufficient evidence to find that Murphy committed a fraud on Ray. As a result, I think the chancellor was correct in her ruling. I would affirm the chancellor's award of a judgment against Murphy for $23,183.10.
¶ 41. This Court will not reverse a chancellor's findings "unless he was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Madison *994 County v. Hopkins, 857 So.2d 43, 47(¶ 11) (Miss.2003) (citations omitted). The chancellor found enough evidence to support a finding that Murphy committed a fraud on Ray when she knew or should have known that Ray was not the father.
¶ 42. Generally, a person cannot seek reimbursement for past child support payments because each payment automatically vests with the child; thus, one cannot recoup it. But he can seek reimbursement against the natural father or against the mother for fraud. McBride v. Jones, 803 So.2d 1168, 1170(¶ 10) (Miss.2002). If Ray can establish that Murphy committed fraud, then she is liable to him.
¶ 43. Fraud requires that the claimant prove the following elements with clear and convincing evidence: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." Koury v. Ready, 911 So.2d 441, 445(¶ 13) (Miss.2005) (citing Mabus v. St. James Episcopal Church, 884 So.2d 747, 762(¶ 32) (Miss.2004)); Hamilton v. McGill, 352 So.2d 825, 831 (Miss.1977).
¶ 44. Here, the facts support the chancellor's finding that Murphy committed a fraud on Ray. What was the representation? Around the time of L.J.'s birth, Murphy made a representation to Ray that she was pregnant and that he was the father. At that time, Murphy was or should have been aware that there was a chance that Ray was not the father. Instead of being honest, Murphy made a representation that Ray was L.J.'s father. The representation was false; Ray was not L.J.'s father.
¶ 45. Was that a material false representation? I think so! As a result of the representation, Ray supported L.J. and made child support payments for nineteen years and paid over $23,000 in child support.
¶ 46. Did Murphy know the representation was false or was she ignorant of the truth? Obviously, Murphy was aware of the fact that she had multiple sex partners around the time of L.J.'s conception. Certainly, based on her intimate knowledge of her sexual affairs, she knew that there was another man who had the opportunity to be the biological father of L.J. There is no evidence that this matter was ever questioned by Murphy to such an extent that a blood test was necessary or appropriate.
¶ 47. Was it Murphy's intent that the false representation should be acted on by Ray and in the manner reasonably contemplated? As a result of being told that he was the father, Ray accepted the financial responsibility of fatherhood. Ray signed the paternity agreement and the child support agreement. This element was met.
¶ 48. Was Ray ignorant of the representation's falsity? Yes. There was no proof presented that Ray was aware that Murphy was having sex with other men. Did Ray rely on the truth of the representation? Yes, he paid $23,183.10 in child support over nineteen years. Did Ray have the right to rely on the representation? Yes. Was Ray injured as a consequent and proximate result of the false representation? Yes. Ray reasonably relied on Murphy's representation and believed that he was L.J.'s father. As a proximate result of Murphy's fraud, Ray paid $23,183.10 in child support for a child that was not his. The chancellor was correct to find that Ray established all of the elements of fraud against Murphy.
¶ 49. I continue by looking at DHS's role in this matter. Murphy perpetuated *995 her fraud through DHS. This action established L.J.'s paternity and Ray as the father. Murphy lied on the affidavit given to DHS and failed to disclose her doubts to DHS.
¶ 50. Murphy told DHS that Ray was the father, and DHS accepted her representation with no questions asked. Ray then signed the agreement of support and the admission of paternity after the DHS case worker threatened to have Ray arrested if he did not sign the agreement and admission of paternity.
¶ 51. The majority makes an interesting argument. In essence, the majority argues that since Ray thought he used a condom when they had sex, then he never believed or had reason to believe that he was the father of the child.[5] From the beginning of this litigation, Murphy testified that she "didn't know [Ray] wasn't the father.... He's the only person I ever thought was the father." Murphy also testified that she told the DHS case worker that Ray was the child's father, and she signed the forms stating he was the child's father. She also testified that for all of those years, she believed Ray was the father of L.J. She testified that she did not believe anyone else was L.J.'s father, and she stated that she still believes Ray is L.J.'s father.
¶ 52. Ray testified that he was at the DHS office with Murphy. He did say to the DHS case worker that he did not think he was L.J.'s father, and according to Ray, the DHS case worker's response was "you [are] the father, so we're gonna have to take her word on it, you know." Ray stated that: "They also asked me had I slept with her. I told them yeah, and I told them I had used protection at that time."
¶ 53. When asked if there was anything else the DHS case worker said, Ray testified, "no more than if I didn't sign those papers they was [sic] going to have the sheriff pick me up." Later, when asked why he signed the petition agreeing to pay child support, he stated that he had been told that "if I didn't sign I was going to jail." Clearly there was a question as to exactly what the DHS case worker told him and why he signed the petition.
¶ 54. The majority has accurately cited selected portions of Ray's testimony. However, I disagree with the characterization of the evidence used by the majority. It was clearly contrary to the chancellor's review and analysis of the evidence. Indeed, Ray had a doubt as to whether he was the father. However, the only testimony of what the DHS case worker said at the meeting was from Ray. Ray testified that DHS threatened him and coerced him to signing the documents. Certainly, Ray's testimony casts serious doubt on whether DHS adequately and properly informed *996 Ray of his right to a blood test. The chancellor certainly considered this evidence in Ray's favor. I am of the opinion that the chancellor, as the finder of fact and the person who observed the parties' demeanor, made a decision that was supported by substantial evidence.
¶ 55. The chancellor was correct in finding that Murphy committed fraud and should be held liable for the child support payments Ray paid in the amount of $23,183.10. The facts show that Murphy deceived Ray into believing that he was the father, and she should be held accountable for her actions. Therefore, I respectfully dissent and would affirm the chancellor's ruling.
¶ 56. However, I cannot agree with the judgment against DHS. DHS is a pass-through agency for child support collections. DHS had the right to rely on Murphy to fulfill its statutory duties. I cannot find that DHS committed a fraud against Ray. Further, it is my understanding that DHS would only retain, at most, a small portion of the child support payments made by Ray. Therefore, I would reverse and remand as to the judgment against DHS for further proceedings by the chancellor to determine the actual amount of Ray's child support payments that were retained by DHS. DHS should have to reimburse Ray for any amounts that it retained.
MYERS, P.J., CHANDLER AND ISHEE, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] We do not ordinarily refer to the parties as "appellants" or "appellees." However, we refer to DHS and Murphy as "Appellants" for the sake of clarity.
[2] In order to protect the privacy of Murphy's child, though he is now an adult, we have substituted his initials in place of his name throughout this opinion.
[3] The parties agree that the child's natural father is Johnny Lloyd, now deceased.
[4] At oral argument, DHS confirmed that it was the practice to offer genetic testing at that time.
[5] The majority seems to say that Ray should have been aware he was not the child's father because he was wearing a condom during their sexual relations. The testimony revealed that they had sex in some unusual places and did not always use a condom. Nevertheless, the majority infers that use of condoms would prevent conception. Indeed, the majority fails to recognize that condoms are one of the lesser effective birth control devices. See Planned Parenthood website, www.plannedparentho od.org/health-topics/birth-control/birth-control-effectiveness-chart-22710.htm. As for condoms, Planned Parenthood states: "Each year, 2 out of 100 women whose partners use condoms will become pregnant if they always use condoms correctly. Each year, 15 out of 100 women whose partners use condoms will become pregnant if they don't always use condoms correctly." www.plannedparenthood.org/health-topics/birth-control/condom-10187.html# effective. Certainly, the majority recognizes that conception may occur even if the parties properly use condoms, and that condoms are not an absolute or failsafe birth control device.